Edward Lee VEST, Gilbert M. Ramirez, and Henry S. Stiehl, Individually and on behalf of all persons similarly situated, Plaintiffs,

United States of America, Intervenor,

v.

LUBBOCK COUNTY COMMISSIONERS COURT and Lubbock County Commissioners, Arch Lamb, Max Arrants, Les Derrick, Alton Brazell, County Judge Rodrick Shaw, C. H. Choc Blanchard, and Texas Commission on Jail Standards, Defendants.

Civ. A. No. CA–5–76–53.

United States District Court,
N. D. Texas,
Lubbock Division.

May 2, 1977.

Wm. M. Hackworth, David Vanderhoff, U. S. Dept. of Justice, Washington, D. C., for intervenor.

E. Warren Goss, Tom West, Daniel H. Benson, Lubbock, Tex., for plaintiffs.

Joe B. Dibrell, Jr., Asst. Atty. Gen. of Texas, Austin, Tex., for Texas Commission on Jail Standards.

Alton R. Griffin, Crim. Dist. Atty., Lubbock, Tex., for rest of defendants.

## MEMORANDUM

WOODWARD, Chief Judge.

The above-named plaintiffs have filed a suit on their own behalf as well as on behalf of all prisoners who were incarcerated in the Lubbock County Jail on the date of May 14, 1976, as well as those prisoners who had previously filed complaints in this court on the subject matter of this suit, together with all prisoners who may be incarcerated in said jail up to the time of the trial which commenced on April 11, 1977 and terminated on April 21, 1977. The defendants are the Lubbock County Commissioners Court, the County Judge and County Commissioners in office at the time of filing of the case, the Sheriff of Lubbock County, Texas, and the Texas Commission on Jail Standards. Successors in the office of County Commissioner to Commissioner Lamb and Commissioner Arrants, Edgar Chance and Coy Biggs, are now party defendants in their official capacity as a member of the Lubbock County Commissioners Court. The United States of America acting through the Department of Justice has intervened with permission of the court and will be referred to herein as "Intervenor."

The pleadings of plaintiffs and Intervenor indicate that the named defendants are sued in their official capacities as members of the County Commissioners Court of Lubbock County, Texas and the Sheriff of Lubbock County, Texas, and the pleadings do not specifically request damages from these defendants as individuals. The prayer for relief does ask for injunctive and declaratory relief concerning the operations of

the Lubbock County Jail and also prays generally for such damages as may be shown. By order of the court, the trial of the case was bifurcated and the question of the amount of damages was deferred until the second stage of the trial.

The complaint and plea in intervention allege certain acts and practices on the part of the defendants that deprive plaintiffs of their rights under the First, Eighth, and Fourteenth Amendments to the Constitution of the United States and also allege a cause of action pursuant to 42 U.S.C. § 1983. Plaintiffs also cite and allege that defendants have violated various statutes of the State of Texas pertaining to the operation of jails by counties in Texas. Jurisdiction is alleged under 28 U.S.C. §§ 1331, 1332, and 1343. The amount in controversy exceeds $10,000.00 and the court finds that it has jurisdiction over the defendants which may be classified as "nonpersons" pursuant to 28 U.S.C. § 1331. *Stapp v. Avoyelles Parish School Board,* 545 F.2d 527 (5th Cir. 1977). As to any cause of action under 42 U.S.C. § 1983 against a "person", jurisdiction is placed in this court by the provisions of 28 U.S.C. § 1343. There is no diversity of citizenship and 28 U.S.C. § 1332 is not applicable.

The trial of the case commenced on the 11th day of April, 1977 and continued through the 21st day of April, 1977, and after the close of the case, the court, having considered all of the evidence, briefs and arguments of counsel, files this memorandum which shall constitute the court's findings of fact and conclusions of law.

The Lubbock County Jail is a brick structure five stories in height, originally built in 1931 with the fourth and fifth floors added in 1950 and 1951. It is located on a block in downtown Lubbock adjacent to the block upon which the County Court House is located.

The day to day operation of the jail is under the supervision of C. H. (Choc) Blanchard, the Sheriff of Lubbock County, and his deputies. In 1969, when Mr. Blanchard took office there were 40 employees in the Sheriff's office, and in that year there were 3 jailers; in 1977, there are 75 employees. The budget for the Sheriff's Department, which is authorized by the County Commissioners Court, has grown from $218,786.00 in 1967 to approximately $800,000.00 for the year 1977. At about the time this trial was commenced, and during recent months, the Sheriff's Department had employed 9 full-time male jailers and approximately 5 matrons who acted as jailers in the juvenile and women's sections of the jail on the fifth floor. Recently, the Sheriff has added 8 more male deputies and one matron. In addition, he utilizes the services of 4 Deputy Sheriffs to act as relief for the jailers who serve during 7:00 A.M. to 3:00 P.M., from 3:00 P.M. to 11:00 P.M., and from 11:00 P.M. to 7:00 A.M. shifts. On the fifth floor there is at least one matron on duty for the full 24-hour period. Jailers have been assigned to the first floor, with 2 on duty during the daytime and only one jailer on duty at night. At no time has there been deputies assigned specifically to floors two, three or four of the jail. Although the recent employment of additional jailers will enable the Sheriff to place a jailer on each floor for the entire 24-hour period, this has not as yet been accomplished.

Notwithstanding the provisions of Article 6871 of the Revised Civil Statutes of Texas,[1] the Sheriff has not kept one guard on each floor of the jail where male prisoners are kept although he has complied by assigning at least one matron to the floor where female prisoners are kept. Further, the indication is that the Sheriff does not provide two employees on guard in the main office of said jail at all times. However there are two or more on duty in the main office during the daytime hours but not on the 11:00 P.M. to 7:00 A.M. shift.

---

1. ". . . In all counties coming under the provisions of this Act, at least one man shall be on guard on each floor of said jail where male prisoners are kept, and at least one matron shall be on guard on each floor where female prisoners are kept; and that not less than two (2) employees shall be on guard in the main office of said jail at any one time. . . ."

The evidence shows that the one jailer on the first floor of the jail on the 11:00 P.M. to 7:00 A.M. shift was not required to make regular rounds of the jail floors during his shift and it was only in those instances where the prisoners "racked down" that he did go to one of the upper floors.

The failure of the county to provide the necessary guards to comply with Article 6871 and the lack of guards on each floor for a full 24-hour period have resulted in a serious mismanagement of the jail, and have in effect permitted the inmates to control the internal functions of the jail in many instances.

As a result many prisoners have been severely beaten by other inmates; they have been deprived of their commissary rights and personal property through the operation of a "kangaroo court" by other inmates; and the resulting lack of discipline and general control have caused a physical deterioration of jail facilities. The Sheriff and his deputies have not been in full control and supervision of the jail as is affirmatively charged by Article 5116 of the Texas Revised Civil Statutes.

In spite of the command of Article 5115 of the Revised Civil Statutes of the State of Texas enacted by the Legislature of this State to all Commissioners Courts, the Commissioners Court of Lubbock County, Texas has not provided a safe and suitable jail for Lubbock County and as the facts will hereafter show has not maintained the jail in a good sanitary condition, it is not properly ventilated, not properly heated and lighted, is not kept in good repair, is not in a clean and healthy condition, its water is not of a safe quality or ample quantity, the mattresses and blankets are not clean, the sanitary standards are practically non-existent, and the dietary practices are not the quality required to maintain good health.

The kitchen, including cooking and serving of meals, is operated by other inmates who have been selected as trusties by the Sheriff. None of these personnel in the kitchen have been examined by medical personnel as required by Article 4476–10, Revised Civil Statutes of Texas. Whether or not these trusties have communicable diseases is unknown, but no steps have been taken by the county defendants to comply with this statute. Further, the kitchen is operated without screens on the windows, with equipment that permits the breeding and infestation by roaches in numerous quantities, with inadequate safeguards to insure good sanitary sterilization of kitchenware, and there is generally a lack of any control by competent personnel over the food services in this jail which houses anywhere from 150 to 175 prisoners on an average each day. Until recently (after this case was filed) only two full meals were served each day, but now inmates are given three full meals.

Prisoners have gone for months without being furnished clean blankets, for weeks without clean sheets and towels, and the mattresses in the jail are unfit for human use.

There is no lighting in the cells or dayrooms and the lighting in the security halls around the cells is totally inadequate.

Rules and practices of the jail permit censoring by jail personnel of all incoming and outgoing correspondence. Upon booking-in, inmates are required to sign a waiver permitting censorship of their mail. If an inmate refuses to sign the waiver permitting the censorship of his mail, the inmate cannot send or receive any mail except legal or official mail. All correspondence incoming and outgoing is opened, scanned, and checked for contraband, escape plans or for abusive language. If the incoming correspondence is deemed abusive or otherwise objectionable, said letters are placed with the inmate's property, which the inmate receives upon release from jail. At no time is the addressee informed that such letter has been intercepted. If abusive language or otherwise objectionable matter is found in the outgoing mail, then such correspondence is returned to the inmate unsent.

The mail is delivered on an average of only two times a week to the inmates. The mail regulations provide that a letter cannot exceed three pages in length. If a

letter is received that contains more pages than the limit, the extra pages are deleted and placed with the inmate's property which he receives when released from jail. Further, the rules and regulations limit the number of incoming and outgoing correspondence to six letters a week incoming and six letters a week outgoing. This limitation is placed upon the inmate because of the amount of time that it would take the jailers to "censor" the mail. In addition, the rules limit the amount of correspondence to be held in the custody of the inmate to five pieces of mail at one time exclusive of legal mail. There are no restrictions on mail censorship and the jail personnel have been permitted to censor regardless of the addressee or whether there is any reasonable cause to believe the mail may or may not contain contraband. Currently these censorship rules have been relaxed insofar as mail to and from lawyers and officials are concerned.

Unreasonable restrictions have been placed on the right of the inmates to have reading materials in their possession. Inmates are not allowed to have hardback books. The testimony is conflicting as to whether a visitor could bring only three paperback books or whether this was the total allowed any inmate at one time. There are no library facilities at the jail and the inmates must rely solely on outsiders to provide them reading materials. Prisoners may not have books with personal notes written in them nor are they allowed to have magazines that show nude persons or so-called obscene literature.

The jail operation is totally lacking in proper classification of prisoners. Although female and male inmates are segregated and the juveniles are segregated from older inmates, the County has never operated under a written classification system of segregating prisoners who are held only for pretrial detention from inmates who have been convicted and are either serving their sentences or awaiting transportation to another detention facility. First offenders are routinely assigned to cells that contain repeat offenders. Further, there has been segregation of prisoners by race. There has been some justification for this in certain instances due to emergency situations, but the regular practice of racial segregation has been carried on even in the absence of any such emergency.

Punishment has been inflicted by jail personnel on the inmates without even the barest rudiments of due process or equal protection being afforded the inmates. Rules have not been posted or uniformly made available to the inmates so as to inform an inmate of the jail rules and regulations and what punishment would be imposed for the infraction of same. What rules have been promulgated by the Sheriff's office are not uniformly applied, and the inmates generally have had no knowledge of the rules although recently the Sheriff has adopted a practice of posting rules in the various cell-blocks.

Prisoners have been summarily punished for infraction of these rules without a hearing prior to punishment. Until recently there had existed no written jail rules pertaining to the conduct of inmate disciplinary hearings. In fact, inmates have not been advised of their right to a disciplinary hearing before being subjected to punishment except with regard to the three disciplinary hearings which have been held since the filing of this action. Only since the inception of this post-litigation practice have the inmates been given advance written notice of the alleged violations of jail rules before being punished. Similarly, it has not been until after the filing of this action that the charged inmates have been given hearings at which witnesses could be called on the inmates' behalf and that the charged inmates have received written statements of findings of fact and the evidence relied upon as a basis for the disciplinary action. On occasions, an entire cell-block has been punished by the deprivation of certain privileges to all occupants of the cell-block when the guards could not determine which individuals had violated a particular rule. This punishment, known as "restriction", has been imposed on pretrial detainees as well as convicted inmates. The enforcement of mass punishment was

imposed in an attempt to get someone to either confess that he was indeed the culprit or by identifying some inmate in the cell-block who was guilty of infraction of the rules.

■ Punishments would range from deprivation of commissary rights to the imposition of solitary confinement in unlighted and bare isolation cells sometimes holding more than one inmate in tiny cubicles not large enough for the humane confinement of even one.[2] Often the cells were bare of any bed clothing and the prisoners were fed bread and water twice daily with every third meal consisting of the regular food fed the general population. Prisoners in isolation were not given adequate soap or other personal hygiene articles nor were they afforded an opportunity to be taken out of isolation for showers. Further, such inmates were denied visits, correspondence, exercise outside the cell and materials to clean the cell. On occasion, some inmates in solitary confinement were stripped of all clothing, and although the Sheriff testified that he had a rule that an inmate could not be in solitary confinement for over two weeks, there were instances when this period was exceeded. The infliction of such punishment without any prior hearing is a serious deprivation of an inmate's rights as guaranteed by the Due Process Clause. *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *Morrisey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972); *Gagnon v. Scarpelli,* 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973).

One of the more serious physical problems in the Lubbock County Jail is the plumbing. There are 72 cross-connections between the drinking water and the sewage system that permitted the drinking water of the prisoners to be contaminated by sewage to the extent that it was noticed not only by its taste but its odor. Admittedly, the Sheriff has, during the course of this trial, employed a plumber to place devices on these cross-connections to prevent this cross-pollution, but the situation has existed for many years and has resulted in a totally unsanitary condition insofar as drinking water and water for bathing is concerned. The toilets are old, broken, and in many cases totally inoperable and stopped up. In the showers the hot water is inadequate or non-existent, and it is sometimes only by chance that an inmate has been able to get a hot shower in even these inadequate facilities.

Other than a recreation room on the fifth floor which may be used by the women and juvenile inmates, there is no recreation facility in the entire jail to afford an inmate an opportunity to exercise or to have any recreational privileges. Recently, after the commencement of this litigation, some prisoners have been allowed television sets that have been brought to them by their family or friends but none are furnished by the County. It is only through reading material brought in by visitors, or playing of cards that any form of recreation is available under the present setup. There is no library at the jail and the inmates do not have access to an outside library.

■ With respect to the fifth floor the plaintiffs argue that there is "contact" between the juveniles and adult women in violation of Article 51.12 of the Texas Family Code, but the court finds that the provisions of this article which provide for solid masonry walls between juvenile facilities and other inmate facilities have been substantially complied with and that the vents and openings through which verbal contact can be made is not a violation of this statute.

It is contemplated that a doctor will visit the jail twice weekly, but more often than not, these visits have only been once a week. The doctor is not furnished adequate facilities to examine a sick inmate and it is the usual custom and practice for a doctor to verbally interview a complaining inmate through the "cheater" window with-

---

2. The isolation cells are 35 square feet in size and each contains a steel bunk and a combination sink, drinking fountain and commode.

out any actual physical examination taking place because of the lack of an examining room or similar medical facilities. Inmates, when they are prescribed medicines by the doctor, have in the past been furnished the entire medicine for one day by the jail personnel. In the distribution of the prescribed medicines to the inmate population, the jail personnel do not supervise the actual taking of the medication. This enables some inmates to store up or save certain of their medicines and to take it all at once so that they could enjoy some "high" or other effect from a larger dose. In at least one case, an inmate saved up a sufficient amount of medicine to enable him to attempt suicide by an overdose.

Those inmates who have tendency toward suicide are not given proper supervision to prevent a suicide attempt, such as close observation; and in some cases items have been left in a jail cell, such as razor blades or a blanket, that would enable a prisoner to attempt suicide. There is absolutely no screening process of the inmates when they enter the jail to determine either their medical or mental condition so that proper care or observation could be afforded to prevent the spread of disease, overdoses of medicine, or any suicide attempt.

As a general rule, mental incompetents or the insane are not segregated from the other prisoners until an incident has occurred requiring such segregation. Likewise, those suffering from epileptic seizures are not given medical attention or observation to prevent harm to themselves even after such conditions have been made known to the jail officials.

Visitation by families or friends of the inmates is restricted to Saturdays and Sundays from 1:00 P.M. until 3:00 P.M., and children under 17 years of age and pregnant women are not allowed in jail. Even when visitors are permitted under these rules, the facilities do not permit any meaningful visit because of the time limitations and the lack of physical facilities for visits. Even when conferring with their attorneys the prisoners are limited by space, although an attempt has been made to furnish facili-

ties on the main floor when lengthy conferences are necessary. In spite of these restrictions on visiting hours and what visitors can bring to prisoners, such practices have not been successful in slowing the flow of contraband such as heroin or similar substances. One prisoner testified that he could get "higher" in jail than he could on the outside because of the ready availability of dope in the jail. It seems that the restrictions as to visitors bear no reasonable relationship to jail security, and in any event these restrictions have not been adequate to stop the flow of contraband.

There have been occasions when guards have physically abused the inmates and as indicated above have imposed cruel and unusual punishment in their operation of the jail. These facts concerning physical abuse by jail personnel have gone unrebutted by any evidence from the defendants in this case, and the court can only accept them as being true.

■ The physical conditions of the jail and the manner of its operation have resulted in conditions that can only be classified as cruel and unhuman under any current standards concerning human decency. Homosexual relations and attacks are prevalent. Even inmates without any homosexual tendency have been forced by other inmates to perform acts of oral sodomy as well as anal intercourse. The resulting degradation to the individual inmate cannot be said to have resulted from any one thing such as mail censorship, lack of personnel, lack of security guards, inadequate kitchen facilities, unsanitary plumbing, the failure to provide adequate medical care or any one of the other facts found above. But the sum total of all of these acts and practices result in deprivations of the rights of the inmates, not only under the First, Fourteenth and Eighth Amendments of the Constitution of the United States, but under the Statutes of the State of Texas. *Williams v. Edwards,* 547 F.2d 1206 (5th Cir. 1977); *Novak v. Beto,* 453 F.2d 661 (5th Cir. 1971).

The evidence shows and proves that the defendants have known of the inadequacy

of the Lubbock County Jail for many years. As early as 1971, the Texas Department of Health advised the County Judge of Lubbock County, Texas that the jail should be operated in accordance with the requirements of Article 5115 of the Revised Civil Statutes of Texas and that at that time it did not meet the standards of that Statute. The Commissioners Court has not totally disregarded its duties as it has each year increased the Sheriff's operating budget at the request of the Sheriff; the number of employees at the jail have been increased; an architectual and structural engineering firm has been employed to advise the County on its needs; and plans have been drawn, but in spite of the fact that these conditions have been brought to the attention of the Lubbock County Commissioners Court on many occasions, very few concrete results are evident. The boilers have been repaired, a new sump pump has been placed in the system, the condenser on the heating unit has been repaired or replaced, the County has attempted to replace and repair the domestic hot water system, which still does not work adequately, and to its credit, the County Commissioners Court authorized and completed in 1973, on the fifth floor of the jail, a juvenile detention center in which the juveniles are separated from other prisoners and in which women prisoners can be kept under the observation of a matron.

But these actions have not been adequate. Still the inmates are subjected to unsanitary conditions, totally inadequate guard supervision, brutal beatings and homosexual attacks, inadequate medical attention, poor and unsanitary food conditions, unlawful censorship of both mail and reading material, and the lack of rules and procedures which would afford them even the barest rudiments of due process and equal protection.

It is to the credit of the defendants that they are currently making bona fide efforts to correct the situation as far as possible. Additional jailers are being employed, a thorough cleaning and repainting of the jail is currently underway, plumbing is being repaired, and the attorney for the defendants has advised, in open court, the rules required by the Texas Commission on Jail Standards are being promulgated as quickly as possible. But this flurry of activity was only commenced after the filing of this lawsuit, and, in fact, most of it was begun after the case was set for trial or even commenced during this trial.

■ The court agrees with the defendants that it would have been unwise to expend great sums of money to renovate the physical plant or even to build a new jail until such time as the Texas Commission on Jail Standards had promulgated rules to give guidelines to such major undertakings, but this does not excuse the failure of the defendants to provide adequate guards in accordance with Article 6871, Revised Civil Statutes of Texas, which has been in effect since 1939 and applicable to Lubbock County since 1970; to prevent unconstitutional censorship; in failing to provide adequate medical services; and to continue to operate the jail in a generally unsanitary condition and to permit inmate control of the jail as above outlined. Although these items would cost money, it is not the type of expenditure that needed any guidelines from the Texas Commission on Jail Standards as the statutes of the State of Texas adequately furnished the needed guidelines and minimum standards in most of these areas.

■ Defendants would have the court refrain from issuing any injunctive relief at this time, but this position cannot be justified. This jail has been operated contrary to state law and in violation of the Constitution of the United States for many years, and the court is of the opinion that injunctive relief is justified and absolutely needed to insure the proper operation of this jail under the standards set not only by the Texas Commission on Jail Standards, but under the requirements of the Constitution of the United States and applicable State laws. The court notes that the improvements in the condition of and the operation of the jail were initiated only after this lawsuit was filed and the very minimum relief due the plaintiffs is the mandate of

this court to defendants to cease operations of the jail in violation of the Constitution and to abide by the Constitution or close the jail.

By and large the evidence in this case has not been contradicted and these conditions cannot be permitted nor condoned and this court will not permit them to continue.

■ The court finds that a reasonable fee for the attorneys representing the plaintiffs in this case is $15,000.00 and that said attorneys are entitled to such fee. This does not include an attorney's fee for any services beyond the entry of a final judgment in the trial court. In setting this fee, the court has taken into consideration the assistance afforded by the Intervenor and Intervenor's attorneys and feels that under all of the circumstances existing, the above fee is a proper one and should be allowed pursuant to 42 U.S.C. § 1988, as amended on October 19, 1976.

The cause of action alleged is predicated on 42 U.S.C. § 1983, and the violations of the plaintiffs' rights afforded by the First, Eighth, and Fourteenth Amendments of the Constitution of the United States, and certain statutes of the State of Texas. Jurisdiction is placed in this court by 28 U.S.C. §§ 1331 and 1343 as well as the pendent jurisdiction of this court. *Taylor v. Sterrett,* 344 F.Supp. 411 (N.D.Tex.1972), *affm'd in part, rev'd in part,* 499 F.2d 367 (5th Cir. 1974), *cert. den.,* 420 U.S. 1983, 95 S.Ct. 1414, 43 L.Ed.2d 665 (1975), *reh. den.,* 421 U.S. 971, 95 S.Ct. 1969, 44 L.Ed.2d 463 (1975), 532 F.2d 462 (5th Cir. 1976).

Although it might be argued that any one of the acts and omissions by the county defendants as above outlined are not sufficient within themselves to justify the relief ordered, the cumulative effect of all of the acts and omissions fully support the conclusions of this court and the relief ordered. *Williams v. Edwards,* 547 F.2d 1206 (5th Cir. 1977); *Novak v. Beto,* 453 F.2d 661 (5th Cir. 1971).

■ The censoring outside of the presence of the inmates of mail, both incoming and outgoing, and the restrictions on reading material violate the inmates' rights under the First Amendment of the Constitution of the United States. *Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974); *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *Gates v. Collier,* 501 F.2d 1291 (5th Cir. 1974).

■ Clearly the facts in this case show that as to those inmates who have been convicted and are serving their sentences, the acts constitute cruel and unusual punishment which is violative of these inmates' rights under the Eighth Amendment of the Constitution of the United States as extended to the states through the Due Process Clause of the Fourteenth Amendment. *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 272, 33 L.Ed.2d 346 (1972); *Williams v. Edwards,* 547 F.2d 1206 (5th Cir. 1977). The evidence also shows that those inmates who have not been convicted but are merely being detained for the purpose of trial, have been subjected to the same treatment and punishment as the convicted inmates. Such pretrial detainees should not be held for punishment of any form, as such punishment would be contrary to the presumption of innocence afforded this class of inmates. *Alberti v. Sheriff of Harris County,* 406 F.Supp. 649 (S.D.Tex.1975). Whether this is violative of their Eighth Amendment rights is questionable, but it is clearly a violation of the rights of the pretrial detainees under the Due Process and Equal Protection Clauses of the Fourteenth Amendment to subject them to any form of punishment or confinement beyond that which is reasonably necessary to insure their presence at trial. *Taylor v. Sterrett, supra.*

■ Further, the procedures in the Lubbock County Jail in meting out mass punishment to entire cell-blocks, holding inmates in solitary confinement and imposing other forms of punishment without any hearing or impartial determination of that particular inmate's participation in any rules' infraction, or even without the inmate's knowledge of the charges against him are contrary to the mandates of the

Due Process Clause of the Fourteenth Amendment and the unequal manner in which punishment is imposed among the various classes of prisoners denies equal protection under the Fourteenth Amendment. *Wolff v. McDonnell, supra; Morrisey v. Brewer, supra; Gagnon v. Scarpelli, supra; Gates v. Collier, supra.*

█ The court further concludes and finds that the county defendants have not complied with Articles 2351, 5115, 6871, and 4476–10 of the Revised Civil Statutes of Texas and these defendants should be ordered to comply with them in full.

It was only recently that the Texas Commission on Jail Standards has set forth the rules and regulations applicable to jails operated by counties and it has further found tentative violations of these standards by Lubbock County. *TEXAS REGISTER,* Vol. 1 No. 97, Dec. 17, 1976, pp. 3576–3605. Lubbock County is not currently meeting these standards.

█ The court has examined and studied very carefully the facts and law applicable to the question of whether or not the members of the County Commissioners Court, the County Judge, and the Sheriff have acted in bad faith. A finding of bad faith would be necessary before any monetary damages could be assessed against these officials. *Kellerman v. Askew,* 541 F.2d 1089 (5th Cir. 1976), citing *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975). It appears to the court that although these defendants may have neglected their statutory duties to provide for the operation and maintenance of a jail in accordance with the standards prescribed by the Texas Legislature and that they have at times ignored these standards by giving preference to monetary considerations, some justification can be found for these actions. The Commissioners Court has not authorized expenditures of large capital sums under the belief and conviction that standards would soon be promulgated by the Texas Commission on Jail Standards that would give them definite guidelines to follow. Further, it cannot be said that they have totally neglected the jail and its opera-

tion as evidenced by its authorization of an increased budget and additional personnel and the work that was authorized in the juvenile ward. The court finds that the necessary requisite of bad faith has not been proven by a preponderance of the evidence and will not order the recovery of monetary damages. However, in view of the history of this litigation and the present knowledge of all of the county defendants of the requirements of law under the facts as they are shown to exist, further violations would certainly be strong, if not conclusive, evidence of bad faith that would justify this court to re-examine the question of good faith as to future damages and to take into consideration all past and future acts by the county defendants in this respect.

█ This court does not take the position that it should at this time order the county defendants to expend large sums of money. However, let there be no mistake, appropriate moneys must be expended in order to bring the operation of the Lubbock County Jail and the maintenance thereof within constitutional conditions and practices. Vindication of conceded constitutional rights cannot be made dependent upon any theory that it is less expensive to deny [them] than to afford them. *Gates v. Collier, supra,* citing *Rozecki v. Gaughan,* 459 F.2d 6, 8 (1st Cir. 1972); *Holt v. Sarver,* 309 F.Supp. 362 (E.D.Ark.1970), *affm'd* 442 F.2d 304 (8th Cir. 1971). This court cannot permit the county to continue to operate the Lubbock County Jail in a manner which is violative of the Constitution of the United States, the laws of the United States, and the statutes of the State of Texas. These are clear mandates that must be followed and county officials have the option of either complying with these constitutional and statutory requirements so as to operate the jail in a constitutional manner or to cease holding and detaining inmates in the institution under its present operation.

To insure compliance by the county defendants that the jail will be operated in accordance with the Constitution and law, and to protect the rights of all inmates in

the county jail, the court will order injunctive relief stating that unless the county defendants comply with the terms and provisions of the injunctive order that the Lubbock County Jail will no longer be used to hold prisoners.

Therefore, the court will retain jurisdiction over all defendants and the subject matter of this suit for an indefinite period of time to insure full compliance with the court's orders and an injunction will be issued against all of the defendants except the Texas Commission on Jail Standards providing, among other things:

[Except as specifically noted, this injunction will apply to all defendants with the exception of the Texas Commission on Jail Standards.]

I

The defendants, in the operation and maintenance of the Lubbock County Jail, will comply with the rules and regulations of the Texas Commission on Jail Standards and will comply with any requirements of this Commission that may be ordered by the Commission with respect to this particular jail.

II

The defendants will comply with and the jail will be maintained and operated in strict compliance with Articles 2351, 5115, 6871, and 4476–10 of the Texas Revised Civil Statutes, and the defendants will cease any activities which constitute violations of these statutes.

III

The defendants will cease their violation of and will not in the future violate any of the provisions of the Constitution of the United States in the operation and maintenance of the Lubbock County Jail.

IV

The defendants, with the exception of the Texas Commission on Jail Standards, shall specifically comply with the following requirements in addition to those generally set forth above:

A. All inmates, including those in solitary confinement, will be furnished three full meals a day and the basic elements of personal hygiene, such as soap, toothpaste, and towels.

B. All persons (including inmates) who prepare, handle, and serve food in the Lubbock County Jail will be given physical examinations and furnished certificates under the provisions of Article 4476–10 of the Texas Health and Sanitation Code, and this must be done within thirty (30) days of the date of this order, and no person will be allowed to prepare, handle, or serve food in this jail without such a certification.

C. The county defendants will furnish sufficient jailers or guards so as to insure that on a 24-hour basis there will be at least one jailer or guard on the second, third, and fourth floors, two on the first floor whose primary duty will be that of jailer and guard, and on the fifth floor there will be two matrons, and if there are male prisoners on the fifth floor at least one jailer or guard on duty at all times.

V

The defendants, and those acting under their directions, will cease censoring either incoming or outgoing mail, but they will be permitted to examine same for contraband, and if contraband is suspected the mail may be opened but not read. Should reasonable and probable cause exist to show the necessity for reading such mail, for security or other proper governmental purposes, then the same shall be read in the presence of the inmate who wrote the letter or who was the addressee thereon. Mail will be delivered to the inmates no later than the day following its receipt from the Post Office Department.

VI

Inmates will be permitted to have reading material in their cells without the limitations presently imposed, but reasonable rules may be entered, published, and dis-

tributed to limit the amount of such material for the purposes of preventing fire or health hazards.

## VII

Inmates shall be permitted access to telephone facilities housed in the jail. The inmates shall be permitted to make outgoing calls in a reasonable number, and for a reasonable length of time, without monitoring or censorship. The installation of pay telephones equipped with timing devices or devices to prevent long distance calls at jail expense may be utilized at the option of the county defendants.

## VIII

The county defendants are directed to establish visitation periods for both convicted inmates and pretrial detainees. Convicted inmates shall be allowed visitation rights between two to four times regularly each week. Pretrial detainees shall be allowed visitation daily. Children and pregnant women shall be permitted to visit. However, the county defendants may promulgate reasonable rules as to visitation which fall within the constitutional standards enunciated herein.

## IX

Pretrial detainees shall not be punished except for violation of jail rules to be promulgated and posted as hereinafter ordered. Said rules and regulations shall be officially promulgated by the Sheriff and jail personnel and communicated to the inmate population by posting said rules and also by oral communication during booking-in procedures. Such rules and regulations shall apprise the prisoner of what conduct can subject him to serious discipline, what penalty he can expect and the procedure by which such determination will be made. This provision shall be complied with by posting of such rules within thirty (30) days of the date of the injunctive order which is to be entered.

## X

All inmates shall be classified immediately upon admittance to the Lubbock County Jail and segregated in the following classifications:

A.  By sex, and the following classifications will be segregated by sex.

B.  All juveniles will be kept separate and apart from older inmates.

C.  All pretrial detainees shall be separated from those who have been convicted. Those who are awaiting trial, but have been previously convicted of any felony for which they have been paroled or released, will not be classified as pretrial detainees.

D.  Persons who have a history of mental health problems, tendency to suicide, or uncontrollable seizures, or communicable diseases, shall be segregated in accordance with good and modern health practices, and any inmate who is subject to suicide or has a known tendency to injure himself will be placed in a cell where a guard has ready physical access and visual observation of such inmate.

E.  Subject to the above classifications there will be no segregation by race, national origin, or color.

The Sheriff will be permitted to segregate from other prisoners any high risk inmates or any inmates known to be violent and are likely to cause harm to other inmates.

## XI

No solitary confinement, mass imposition of punishment by cell-blocks, or other physical punishment shall be imposed on any inmate without affording him an opportunity for receiving a written copy of the charges against him and a chance to appear before a three person board (not composed of inmates, jailers or guards), and with the right to examine witnesses and to furnish witnesses and evidence on his own behalf within reasonable limitations. This rule shall not prevent any jail personnel from acting in emergency situations to prevent jail escape, violence, or similar action on the part of the inmates that threaten the secur-

ity of the jail and well-being of other prisoners, but only such actions will be taken in emergency situations that are minimally necessary.

## XII

The county officials will cause to be made an inspection by either the Texas State Department of Health or the United States Department of Health of the kitchen facilities and serving procedures. The first of these inspections will be made on or before the first day of the month following the sixtieth day after the entry of the injunctive order in this case and quarterly thereafter. The county officials will comply with the requirements of the inspector making such inspection or else petition this court for relief from such requirements, but the compliance or petition for relief must be accomplished within thirty (30) days after a report has been received from the health commissioner.

## XIII

On or before the 1st day of September, 1977, the county officials will furnish to this court their plan for the installation of recreational facilities that will insure all inmates of at least three separate one-hour sessions of outdoor exercise, weather permitting, and will make provisions for the enactment of such plan within six months from the date of the injunctive order to be entered in this case. Television sets will be permitted in the cells or cell-blocks provided they are furnished by the inmates or friends or family of the inmates, and subject to reasonable rules and regulations to be issued and enforced by the Sheriff concerning the hours of television usage and such other restrictions as shall be necessary to insure that the operation of same will not interfere with the proper jail functions and operations. Radios will be permitted on a like basis.

## XIV

The county officials will provide regular visitations by a doctor possessing a medical degree and certificate on a basis of at least twice weekly and will furnish such doctor facilities and place or places to actually examine the patients if the doctor deems such examination is needed. Further, provisions will be made for doctors, nurses or paramedical personnel to be on call for any medical attention including hospitalization that may be necessary to the well-being and health of the inmates. Upon entry into the jail, each inmate shall be questioned and if necessary medically examined to determine whether or not the inmate has a communicable disease or any particular medical problem, and, if so, same shall be immediately called to the attention of a medical officer. Medicines will be dispensed strictly in the amount, time and manner prescribed by the doctor.

## XV

In addition to the inspection by the Texas Department of Health or Public Health Service of the United States of the kitchen facilities and food services, an inspection shall be made by either of these organizations of the sanitation and hygiene conditions of the jail and which are properly needed for the operation of the jail in a sanitary manner, including plumbing, water, hot water facilities, personal hygiene articles such as soap, toothpaste, etc., and to insure proper lighting as required by the Texas Commission on Jail Standards. The inspector will report his requirements directly to the Sheriff and these requirements shall be met within the time called for and under the same conditions as required for the kitchen and food inspections. Further, this inspection shall insure that proper bed clothing, mattresses, and towels are furnished to satisfy the requirements of the Texas Department of Health or the Texas Commission on Jail Standards.

## XVI

The injunctive order shall contain an appropriate provision for the Sheriff and County Commissioners Court to report to the court on or before September 1, 1977 and every three months thereafter giving the status of the improvements and operat-

ing procedures which are the subject matter of the injunction, and such other information necessary to show full compliance with the court's injunctive order. Copies shall be furnished to all opposing counsel and if required, a hearing to determine whether or not compliance is being accomplished will be held.

### XVII

It is not intended that the specific requirements above modify or supersede the rules and regulations of the Texas Commission on Jail Standards or any of the requirements of law, but shall be in addition thereto. Any conflict between the requirements above and the rules and regulations of the Texas Commission on Jail Standards shall be resolved by the application of the more stringent standard.

### XVIII

With regard to the Texas Commission on Jail Standards, the court directs that the Commission, in accordance with the rules, practices, procedures and customs, will inspect and review the construction, maintenance and operation of the Lubbock County Jail periodically. Upon completion of said inspections, the Commission will furnish to the court findings, including therein violations or omissions of the county defendants with respect to the rules and regulations promulgated by the Texas Commission on Jail Standards.

### XIX

The formulation and implementation of comprehensive rules or plans required by the Texas Commission on Jail Standards shall be accomplished and done in accordance with the requirements of this Commission. Such rules shall include but shall not be limited to topics such as sanitation, discipline, educational and rehabitational programs, inmate privileges, emergencies, and supervision of females.

### XX

The court reserves the right under its continuing jurisdiction of this case to add to, delete from, change, or alter any of the provisions of the injunction after proper notice and hearing.

### XXI

The court will not include in its injunctive order certain matters which the defendants testified were currently being done, such as a thorough cleaning of the jail and installation and repairs of plumbing fixtures as well as other jail improvements, but the defendants are expected to continue such improvements.

### XXII

Judgment will be entered against the County for the payment of the attorney's fees directly to all counsel for defendants.

### XXIII

The injunction will provide for compliance in full by September 1, 1977 of all the above unless otherwise specifically ordered.

The Attorneys for plaintiffs and Intervenor will prepare the proper judgment and injunctive order and submit it to the court for entry within fifteen (15) days.