Lawrence R. ALBERTI, et al.

v.

Jack HEARD, Sheriff of Harris
County, et al.

Civ. A. Nos. 72–H–1094, H–78–1649.

United States District Court,
S.D. Texas,
Houston Division.

Dec. 18, 1984.

**445**

James Oitzinger and Bruce Griffiths, Houston, Tex., for plaintiffs.

Ray Speece, Asst. Dist. Atty., Billy Lee, Asst. County Atty., Houston, Tex., for defendants.

## ORDER

CARL O. BUE, Jr., District Judge.

A hearing was held in this case July 19, 1984, through July 27, 1984, to consider plaintiffs' motion for contempt. The hearing was re-opened for three days beginning September 26, 1984, to allow for the completion of the parties' respective presentations. Briefly stated, plaintiffs' motion alleges that the Sheriff has failed to comply with the Court's order of May 20, 1983 ("the May 1983 Order") in which the Court adopted at defendants' request the ratio of one (1) guard for each forty-five (45) inmates as was required by the Minimum Jail Standards of the Texas Commission on Jail Standards. In response to the plaintiffs' contempt motion, the Sheriff all but stipulates that he has never technically complied with the May 1983 Order. (Post Trial Stipulations Concerning Number of Security Personnel). Instead, the Sheriff now urges the Court to abandon the rigid one-to-forty-five ratio previously adopted by the Court in favor of the Sheriff's new, more flexible staffing plan based on post assignments which is currently in operation. The defendant Commissioners Court has consistently maintained throughout these proceedings that it is merely a bystander as the

plaintiffs' contempt motion does not allege any wrongdoing on its part. Counsel for Commissioners Court maintained a passive posture at the hearing and did not participate in the examination of witnesses or the solicitation of proof.

The evidence elicited at the hearing reveals glaringly that regardless of which of the two minimum staffing requirement plans the Court is ultimately persuaded to sanction (*i.e.*, one-to-forty-five or post assignment), the actual staffing is still drastically below constitutionally acceptable minimum levels. Indeed, even the Sheriff's penological expert concedes that an additional sixty-five (65) positions are required to bring the Sheriff's post staffing plan to a constitutionally acceptable level.[1] (*See* Defendant's Exhibit No. 44 at p. 44.) Overall, the totality of the conditions at the Harris County jails as they now exist indicates that the jail staff includes too few deputies and sergeants to protect the inmates from one another through effective supervision. These conditions exist in contravention of the Eighth Amendment mandate for the eradication of cruel and unusual punishment. Accordingly, for the reasons stated below, the Court adopts the theory of the defendants' newly proposed post staffing plan and post orders with certain upward adjustments in the number of posts necessary to meet the constitutional staffing minimums. Additionally, consideration of the plaintiffs' motion for contempt is deferred pending expiration of defendants' grace period for compliance with this detailed current order on staffing.

## THE PROCEDURAL HISTORY

The procedural history of this litigation is well known to all of the parties in this case, and, accordingly, it would serve no useful purpose to present a detailed account of all of the events which have tran-

---

1. As discussed *infra*, in the recently amended Minimum Jail Standards, the Texas Commission on Jail Standards abandoned the 1 to 45 ratio requirement in favor a 1 to 48 ratio and a "waiver" provision. While the decision to amend the standard to 1 to 48 seems to be arithmetically based, the Court is of the view that the 1 to 48 ratio plays no significant role in determining the course of action that this Court must follow and therefore will not be discussed in depth in this Order.

spired since the filing of this suit in 1972. However, in order to place the precise staffing issues presently under consideration into proper perspective for both this Court and any subsequent reviewing court, a brief recapitulation of certain events is in order.

### The Old Central Jail

Plaintiffs filed suit in this Court on August 14, 1972, against members of the Harris County Commissioners Court and the Harris County Sheriff's Department, alleging, *inter alia,* numerous violations of their constitutional and statutory rights as the result of defendants' operation and maintenance of county prison facilities. On February 4, 1975, a Consent Judgment was entered into whereby the defendants promised to bring then-existing facilities and operations into compliance with federal and state standards. Specifically, the Commissioners Court agreed to "provide jail guards/staff sufficient for security for jail facilities without the use of inmate assistance," and the Sheriff and his assistants agreed to use "diligent good faith efforts" to "employ a sufficient and adequately trained staff, guards and deputies to assure the protection of persons incarcerated in the Harris County jails." The Court retained exclusive jurisdiction to issue any and all interim orders necessary for immediate relief until such time as the terms within the Consent Judgment were complied with by the Commissioners Court as well as the Sheriff. *Alberti v. Sheriff of Harris County, Texas,* No. 72–H–1094, slip op. at 3 (S.D.Tex. Feb. 4, 1975).

Shortly after the entry of the Consent Judgment, defendants' compliance therewith was questioned and hearings lasting seven days were held. In December of 1975, as a result of said hearings, the Court issued a sweeping remedial order which addressed, *inter alia,* the issue of adequate staffing for the then-existing facilities. *Alberti v. Sheriff of Harris County, Texas,* 406 F.Supp. 649, 678, 691 (S.D.Tex. 1975). The Court found that despite the entry of the Consent Judgment, the jails continued to be unsafe and understaffed.

*Id.* at 669. Consequently, defendants were ordered to provide for the hiring of a sufficient jail staff based upon a ratio of one jailer for every twenty (20) inmates. It was further ordered that inmates were not to act in a supervisory or administrative capacity nor administer disciplinary action over other inmates. *Id.* at 678. That order was never appealed.

### New Jail Planning and Design

Although the ubiquitous issue of adequate minimum staffing levels has surfaced several times since the Court's 1975 Order, the next relevant instance arose in 1978 in the context of the hearings leading to the Court's approval of the new central jail facility. During these hearings, the plaintiffs raised serious questions concerning the efficacy of that facility. They were concerned particularly about the large percentage of multiple occupancy dormitory housing units, their experts contending that such a structural design might well lead to a need for increased staffing and administrative costs.

Also testifying during these 1978 proceedings was Robert O. Viterna, chairman of the newly created Texas Commission on Jail Standards ("Commission"). It was the Commission's unqualified view that the proposed design of the new facility fully comported with its recently promulgated standards. Accordingly, although alerted to the potential need for increased staffing, the Court, relying heavily upon the testimony and expertise of the Texas Commission on Jail Standards and desiring to leave to the Sheriff's professional judgment and experience the decisions regarding the administration of the facility, concluded that the cell configuration then under consideration by defendants was not unconstitutional.

In its order of approval, replete with reservations and conditioned upon the fulfillment by defendants of certain continuing staffing obligations, the Court rearticulated the potential hazards of difficult and costly administration of the facility and possible future obsolescence resulting from higher evolving constitutional standards.

*Alberti*, slip op. at 13–16 (S.D.Tex. September 14, 1978).

### Staffing of the New Central Jail

Hearings were held again in late 1982 and in early 1983 to determine the appropriate staffing plan for both the new facility and the detention center. The Sheriff was directed to file a complete staffing plan covering both facilities, setting forth the number and job description of all personnel, the floor and shift to which each person was to be assigned, and the duties and responsibilities of each supervisor. Because the Court was concerned with its adequacy, the Sheriff was ordered to submit the plan to the Texas Commission on Jail Standards for review. The Commission, in turn, was directed to tour the facilities and to be prepared to express its opinion as to the adequacy of the plan in the context of state standards and existing law. *Alberti*, slip op. at 8 (S.D.Tex. June 14, 1982) and slip op. at 2, 3 (S.D.Tex. July 7, 1982).

While the proposed plan did meet ultimately with the approval of the Commission and the Court, the crucial question presented at the hearings in February and March of 1983, was not so much the adequacy of the plan, but whether the defendants had enough security guards actually on the housing floors in fulfillment of the plan. *Alberti*, slip op. at 1, 2 (S.D.Tex. May 20, 1983). The evidence revealed, and the defendants admitted, that both the new jail and the detention center were critically understaffed on the housing floors and that the "one-to-forty-five" ratio was not being satisfied.[2] However, defendants assured the Court that they would be in compliance with the state law by the end of June, 1983, by having a total staff of 574, including both security guards and clerical or civilian personnel, fully trained and on duty. *Id.* at 3.

Thus, the Court, at the vigorous insistence of the defendants, adopted the one-to-forty-five minimum staffing ratio that they now ask it to abandon. Specifically, the Court ordered:

> The defendants Sheriff and Commissioners' Court shall by June 30, 1983, staff the housing floors of both detention facilities with one (1) guard for each forty-five (45) inmates on the floor and adhere in all respects to the requirements of the Texas Commission on Jail Standards. The guards assigned to the floors shall actually be deployed there continuously, except for brief periods to transport inmates but to return promptly to the assigned floor. The guard in the floor control center (picket) may be counted so long as he monitors the electronic call system closely and responds to each call with the realization that it could be an emergency. Supervisors may be included in the number only if they oversee only one assigned floor.

*Id.* at 8.

In June of 1983, inspectors from the Texas Commission on Jail Standards toured the new central jail and detention center. The central jail was found to be in compliance with state staffing standards. However, a certificate of noncompliance was issued due to inadequate staffing at the detention center.

### Defendants Rethink The May 1983 Order

In August of 1983, the Sheriff found it difficult to maintain the one-to-forty-five guard to inmate ratio because of the lack of flexibility that it provided. By this time, the Sheriff had had enough experience with the one-to-forty-five ratio to realize that he was not going to be able to live up to his representations and comply with the Court's May 1983 Order. It was at this time that the Sheriff's Department inde-

---

**2.** The applicable standard, or "one-to-forty-five" ratio as it has come to be known, required the following:

> Inmates shall be supervised by an adequate number of corrections officers to comply with the requirements of state law and these standards and to carry out the facility plans estab-

lished pursuant to these standards. In no event shall this be fewer than one corrections officer on each floor of the facility on which 10 or more inmates are housed, nor less than one corrections officer per 45 inmates.

Minimum Jail Standards § 217.14.004 (1980).

pendently devised its own post staffing plan. (Testimony of Major F.B. Reynolds.)

Matters then took a completely different direction. On August 2, 1984, Harris County Judge Jon Lindsay wrote to the executive director of the Texas Commission on Jail Standards, Robert O. Viterna, to recommend that certain revisions be made in the one-to-forty-five guard to inmate ratio mandated by § 217.14.004 of the Minimum Jail Standards (1980). (*See* Plaintiffs' Exhibit No. 169.) Judge Lindsay wrote also to other county judges across Texas to seek support in changing that jail staffing requirement. (Plaintiffs' Exhibit Nos. 108 and 110.) Like Sheriff Heard, Judge Lindsay professed that the one-to-forty-five ratio was both inflexible and inefficient. Judge Lindsay's letters urged that the guard to inmate ratio be changed to one-to-forty-eight, and that the one-to-forty-eight requirement then be waived for larger jails in favor of no minimum ratio whatsoever.

On August 29, 1983, plaintiffs filed the motion for contempt which precipitated the latest Court hearing. As stated, the plaintiffs' motion charged that the Sheriff had failed to comply with the Court's May 1983 Order which adopted the one-to-forty-five ratio.

On September 29, 1983, the Texas Commission on Jail Standards met in Austin to consider, *inter alia*, the proposals by Harris County's Commissioners' Court and Sheriff Heard for changes in the state regulations governing supervisory staff. The defendants' representatives, including Sheriff Heard who is a member of the Texas Commission on Jail Standards as well as a member of the Commission's subcommittee that deals with staffing plans, spear-headed the discussions to change the staffing requirements. Chief among the reasons advanced for seeking the revisions was the inflexibility and inefficiency of the one-to-forty-five ratio.

Specifically, the Sheriff when urging the passage of the provision which would allow waiver of the one-to-forty-eight ratio requirement contended that because the inmate population on a housing floor fluctuated greatly on any given day, the ability to maintain accurately the correct number of guards mandated by the strict one-to-forty-five ration was a managerial nightmare. Additionally, it was noted that the existing one-to-forty-five ratio had no empirical or scientific foundation but, in the words of Sheriff Heard, "we picked it [the ratio] out of the air." (Plaintiffs' Exhibit No. 205A at p. 80.) Although others at the meeting concluded otherwise, Sheriff Heard claimed that the reason the defendants were anxious to obtain the revisions had nothing to do with the proceedings in federal court.[3] (Plaintiffs' Exhibit No. 205A at pp. 61 and 85.) Finally, when the Commission began to balk in its consideration of the waiver provision as urged in the defendants' proposals, Sheriff Heard stated that if the Commission did not act that day, he would be back the next week demanding a special session of the Commission.[4] (Plaintiffs' Exhibits No. 205A at p. 82.)

---

3. This view was not shared by all participants. Two months after that meeting, Sheriff Mike Davis of El Paso wrote:

 The rule change set forth in Exhibit "B" is not a positive step forward. Indeed this rule change is a giant leap backwards. I sincerely believe the only basis of this proposed rule change is an attempt to protect Harris County officials from contempt proceedings in *Alberti v. Sheriff of Harris County,* 406 F.Supp. 649. For the record I would note that the rules were not changes [sic] to protect the El Paso County Officials when they were held in contempt in 1978. Further, I cannot believe] [Judge Bue will be hoodwinked by this "slight [sic] of hand" trick.

 (Plaintiffs' Exhibit No. 113, exhibit C.)

4. At one point during the meeting, Mr. Viterna commented about Harris County's waiver provision proposals in the following manner:

 What you are proposing if it would go through, is going to be changing the staffing of the jails from the Sheriff to the Commissioner's Court because they are the only ones who can approve the staffing, the positions and the funding, and while some of our sheriffs have vary [sic] fine relationships with their commissioner's court, it's going to work out we have others where the situation is reversed, and, with each two years as we get elections it will be reversed and as we get these plans in, ...
 BUSTAMANTE—This Commission has the final say on that.

After summary discussion and consideration, the Texas Commission on Jail Standards approved for publication two modifications:

(1) a change in the minimum guard-to-inmate ratio on housing floors from one-to-forty-five to one-to-forty-eight; and

(2) a provision that the Commission may waive the minimum ratio requirement upon submission and approval of a total staffing plan that assures the safety and security of inmates.

(Plaintiffs' Exhibit No. 205A.) Additionally, the Commission authorized the defendants to submit for approval an alternative staffing plan based on post assignments and sanctioned the granting of a staffing variance while the rule change was being considered. The day after the Commission meeting, the Sheriff filed his response to plaintiffs' motion for contempt.

Both the proposed rule changes and the Sheriff's post staffing plan were approved by the Commission. The new rule for supervision of inmates now reads as follows:

**Supervisory personnel.** Inmates shall be supervised by an adequate number of corrections officers to comply with state law and these standards. One corrections office shall be provided on each floor of the facility where 10 or more inmates are housed, with no less than one corrections officer per 48 inmates or increment thereof for direct inmate supervision. *This officer shall provide visual inmate supervision not less than hourly.* Sufficient corrections officers as accepted by the Commission shall be provided to perform functions required by minimum jail standards such as booking, classification, discipline and grievance, education and rehabilitation, inmate movement, library, privileges (i.e. visitation, correspondence, telephone, commissary, and religious services) and recreation and exercise. A waiver may be granted by the commission as to minimal supervisory personnel-to-inmate ratios required elsewhere in these rules. A plan, concurred in by both commissioners court and sheriff's department may be submitted to the commission which provides for adequate and reasonable staffing of a jail facility. This rule shall not preclude the Texas Commission on Jail Standards from requiring staffing in excess of minimum requirement when deemed necessary to provide a safe, suitable and sanitary jail nor preclude submission of variance requests as provided by statute or these rules. (Adopted 12/26/83.) (Emphasis supplied.)

Minimum Jail Standards § 217.14.004 (1984). The new rule with its vague catch-all waiver provision thus allows the defendants to submit a staffing plan based on post assignments. What is noteworthy is that the new rule as applied to this case gives this Court no professional guidance whatsoever on jail staffing standards. Abandoning any strict ratio requirement, defendants independently fashioned a post staffing plan which fitted their concept of what constituted a safe and suitable jail requiring over one hundred fewer guards assigned to posts than the one-to-forty-five ratio. Because such a plan theoretically was subject to Commission review, defendants submitted it to the Commission in early October, 1983. Within a few weeks thereafter, Mr. Viterna "tentatively" ap-

VITERNA—That's right. Now let me ask the Commission something. Are the Commission members ready to sit down and go over staffing plans? Because, if it is a staff function, and the particular commissioner's court, or the particular sheriff, disagrees with any decision that I make, it's gonna come right back to you and you're going to have to sit here and have to go ten, twelve, fourteen hours which it took to work out a staffing plan, even a compromise, for Harris County. Now this is what it is going to amount to, and, taking a word from our good Commissioner from Harris County here, if the original 45 to 1 was plucked out of the air, then certainly what we're doing here today is using the left hand and plucking another solution out of the air. It's worth full discussion and full public hearing and getting people who are totally interested in large numbers in here and hear them and listen to what they have got to say. This is [sic] got tremendous ramification across the state and tremendous ramification to the jails.

Plaintiffs' Exhibit No. 205A at pp. 91–93.

proved the plan, gave Sheriff Heard permission to implement it, and proposed to submit it to the Commission as a whole for final approval in November, 1983. In essence, the variance was granted during the month of October, 1983 and is still in effect. (Plaintiffs' Exhibit 210 at pp. 17–22).[5]

By mid-July of this year, the Sheriff's post staffing plan authorized by Jail Standard § 217.14.004 (1984) and approved by the Commission was fully implemented in both facilities.[6] (Testimony of Major F.B. Reynolds.) An outline of the officer post locations in the Sheriff's staffing plan are shown in detail in Defendant's Exhibit No. 44 at pages 29 through 31.

### THE CONTEMPT HEARING

The evidence presented at the contempt hearing covered a wide variety of topics. Everything from the physical description of the two jail facilities to the Sheriff's staffing plan was discussed.. Prior to discussing this testimony, however, the Court deems it appropriate to describe briefly the physical layout of a typical housing floor at the central jail so that the testimony that follows will be more easily understood.

In the central jail, each housing floor is approximately one and one quarter acres in size. To put that into perspective, one floor at the central jail is larger than most other jails in the nation. The housing capacity of each floor varies from a low of 192 to a high of 452 inmates. The housing floors are subdivided into four sections or quadrants. Each quadrant contains a variety of types of housing areas. Most of the units provide for multiple occupancy in increments of anywhere from four to twenty-four bunks. There is some single celling. Each housing area contains a security vestibule at its entrance that allows for partial observation of inmate activity within each unit. In addition, each floor contains a central floor control center ("the picket") where one deputy electronically monitors the floor. Plaintiffs' Exhibit No. 209 is a blueprint of a typical housing floor in the central jail.

### Inmate Testimony

Approximately two days of testimony was received from a cross-section of inmates in the central jail. Despite the inherent credibility problem normally attached to inmate testimony, and despite the Sheriff's efforts to impeach their testimony, a review of this evidence reflects that a high level of inmate violence exists in the jail. This testimony was corroborated by all three outside expert witnesses. Additionally, the inmates' numerous graphic examples of assault, rape and other violence clearly established the inability of the existing staffing plan and supervisory regulations to protect adequately the inmates' personal safety. The testimony established that the violence is widespread and not confined to just a few isolated incidents. Furthermore, it should be noted that the level of violence established by the inmate testimony may be only the tip of the iceberg, as it is apparent that the inmates have an unwritten code of silence which results in most of the acts of violence going undetected. Additionally, this high level of violence will likely increase as the jail population in the central jail approaches capacity.

In addition to testifying regarding the high state of violence in the new central jail, the inmates also testified at length regarding inmate use of the electronic call-button system. This two-way communication system is intended to permit the in-

---

5. While it is somewhat confusing as to which terminology is correct, variance or waiver, since both are used by counsel in a seemingly interchangeable fashion, it is quite clear that the Post Staffing Plan proposed by Sheriff Heard was approved by the Commission in October of 1983.

6. Although the post staffing plan was fully implemented in both facilities in July of this year,

Jail Captain Kenneth Berry testified that the post staffing plan was in effect when he became Jail Captain of the new central jail in October of 1983. In fact, it was his testimony that no attempts were made to comply with the one-to-forty-five ratio. Captain Berry's testimony conflicted with Major Reynolds' testimony on when the post plan became effective.

mates readily to contact and converse with the deputy in the picket. The inmates use the call-buttons for a variety of reasons. For instance, the inmates use the call-button to summon deputies to break-up inmate fights or to respond to an emergency health problem that an inmate is experiencing. The call-buttons are often used by the inmates for more mundane reasons such as finding out the date of their next court appearance, asking for additional supplies such as toothpaste and toilet paper or inquiring as to the time of day. Some inmates abuse the call-button system by using it to harass the deputy in the floor control center. Finally, some inmates vandalize the call-buttons to the point of rendering them inoperable.

A hotly contested aspect of the call-button system was the length of time it took the floor control center and floor deputies to respond to a call. The inmates testified that the deputies' response time ranged from immediate to forty-five minutes to no response at all. The deputies strongly disputed those allegations. Regardless of which side is correct, the testimony from the inmates and the experts reveals that the call-button system is an ineffective and inefficient substitute for human surveillance and in no manner justifies the presence of fewer guards.

*The Expert Witnesses*

A. *Robert Buchanan* (for Plaintiffs)

The first expert called by the plaintiffs was Robert Buchanan ("Buchanan"). Buchanan was hired by plaintiffs to review the Sheriff's classification procedures and in so doing, conducted a site visit at the Central Jail on July 5, 1984. Although classification of inmates to determine housing assignments is inextricably interwoven into staffing decisions, it is not within the scope of this order to review defendants' classification procedures in depth. Overall, Buchanan noted that Harris County was doing an adequate job of classifying inmates into groupings which appeared to be homogeneous in terms of age and offense history. The primary weakness was found to be in the second level of classification

related to security and custody determination. Although he believed that the physical plant design, consisting of cell types mixed on each floor, minimized the capability of the classification personnel to separate prisoners into efficient large groupings based on their security and custody requirements, he emphasized that the need to do so was not minimized. (Plaintiffs' Exhibit No. 189 at p. 20).

Though not called upon to render his opinion on the Sheriff's staffing plan, Buchanan did have and expressed strong views on that issue. The Court is aware of the limitations placed on Buchanan's testimony by his lack of in-depth scrutiny of the staffing plan and, accordingly, gives it appropriate weight. Notably, however, his opinions acquire considerable stature since they were largely echoed by the other experts who appeared at the hearing for the specific purpose of reviewing the Sheriff's staffing plan.

The major criticism that Buchanan had concerning staffing at the two jails stemmed from the new central jail's highly compartmentalized physical design. From a security point of view it was the poorest that he had ever seen. To the Court's surprise and dismay, this harsh criticism of the jail's physical lay-out was shared strongly by the other experts as well. Buchanan stated that the physical design contained so many blind spots or routinely unobservable areas that the officers were unable to supervise effectively the inmates on a continuing basis. In his opinion, these blind spots, when coupled with the surveillance problems that they cause, contributed to the high number of assaults.

Another aspect of the physical design in the new jail which he felt made supervision of inmates unusually difficult is the cell configuration which contains a mix of dormitories, multiple occupancy cells and single cells. As a result of being able to view adequately only the dayroom areas, the officers must physically go into the cell areas on an occasional basis to check the well being of the people in the cell. However, because the guards actually must go

into the cell unit itself to observe conditions properly, the inmates can and do predict with some certainty that a guard will not return for a significant span of time after he has once visited their particular cell.

An aspect of the classification system in the housing floors that he believed compounds the staffing problem is that all levels of security risk inmates are assigned to each floor. In other words, each floor contained maximum security risk inmates as well as minimum security risk inmates. He stated that this arrangement renders it impossible to staff the floors on a security classification basis. He suggested making an entire floor one type of security risk so that more efficient and effective staffing assignments could be made. In sum, it was Buchanan's opinion that the only way to overcome the handicap imposed by the ill-conceived physical design of the jail, given the classification system as it now exists, is to increase the number of staff. He claimed that a minimum of nine deputies per floor should be required at all times on the housing floors in the central jail. This would allow for two guards to be stationed in each quadrant, one officer to back up the other officer when he enters the housing area, and one in the picket. According to Buchanan "any normal security procedures would not permit a security officer to enter a maximum security unit by himself."

Two other areas of interest that Buchanan testified to include the use of the call-buttons and the use of staffing ratios. Basically, he is not an advocate of either. He believed that call-buttons are not a reliable summoning device because an inmate under attack probably cannot get to the call-button to activate it. He opposed strict staffing ratios because he believed that one state-wide ratio cannot fit all of the different types of jail facilities in Texas.

### B. *Norman R. Cox* (for Defendants)

The Sheriff's expert witness on jail staffing was Norman R. Cox ("Cox"). Like all three of the plaintiffs' experts, the Court found Cox to be abundantly qualified in penology. Cox conducted an on-site analysis of the Harris County facilities in June of 1984, and subsequently prepared a detailed report on the Sheriff's post staffing plan. (Defendant's Exhibit No. 44.) The majority of his testimony dealt with his findings contained in that report. Consequently, the Court, rather than recount all of his testimony, will only attempt to highlight the most relevant aspects.

Cox stated that "[t]he overall configuration of inmate housing units are [sic] **not conducive to good observation and supervision** by staff." (Defendant's Exhibit No. 44 at p. 13.) The physical layout of both facilities dictates intermittent observation of the inmates, especially with regard to the sleeping cells. He believed that the architects who designed the central jail did not have a full appreciation of how a jail functions. It was also his opinion that the rigid cell specifications and dimensions mandated by the Texas Commission on Jail Standards results in jail designs with reduced visibility throughout the State. He stated that the poor configuration of the new central jail requires that officers make rounds more often to provide effective supervision. He was less critical of the design of the detention center but noted that "**the current crowded conditions** of the facility **inhibit effective observation and supervision.**"[7] (Defendant's Exhibit No. 44 at p. 15.)

Overall, Cox approved of the Sheriff's concept of a post staffing plan. However, he believed that twenty-two (22) additional

---

7. The population at the central jail on July 27, 1984 was 2,522 inmates. The population at the detention center on that date was 1,117 inmates. In short, the detention was operating over capacity and the central jail was under capacity. (Testimony of Major F.B. Reynolds.) It was represented to the Court that upon the completion of repairs on the smoke extraction system at the central jail, additional space will become

available there to alleviate the current overcrowding at the detention center. Further, Cox's testimony concerning the overcrowded conditions was corroborated by another expert who testified that the overcrowded conditions at the detention center were the worst he had ever witnessed. He observed inmates sleeping on the floors, on tables and next to toilets. (Testimony of Warren Benton.)

sergeant posts were needed. He thought also that additional deputy posts were needed on the second floor of the central jail to supervise the classification housing areas, and that the utility deputies could be redeployed to lessen their dead time. Finally, he recommended that forty-three (43) additional deputies would be required to meet the shift relief factor. (Defendant's Exhibit No. 44 at pages 42, 44 and Appendix C.) In sum, he believed that a typical housing floor at the central jail requires a minimum staff of seven. This breaks down to one deputy in the floor control center, one deputy in each quadrant, one utility deputy and one sergeant. He stressed that a deputy must be present in each quadrant at all times. A detailed outline of his recommended staffing plan for both facilities is found in Defendant's Exhibit No. 44 at pages 29 through 31, and Defendant's Exhibits No. 49 through 51.

Cox rejected the plaintiffs' experts' opinions that at least two deputies were required per quadrant. It was his view that by bringing the inmates out of their cells into the day areas, one deputy could adequately observe them on an intermittent basis from the security vestibule. Moreover, he believed that the deputies were not trained, nor should they be trained, to interact frequently with the inmates as this is more of a "counselor" role. Finally, Cox asserted that frequent "intrusions" into the cells would result in increased tension among the inmates as they would interpret such intrusions as being an invasion of their "personal space".

Cox testified regarding both the call-button system and the existing level of violence. First, as to the call-buttons, he believed that it was improper for the Sheriff to rely upon the call-button system as the primary emergency response mechanism. It was his opinion that the guards themselves should be the primary emergency response system. He explained that inmate peer pressure discouraged the use of the call-button to report on inmate activity within the housing unit; however, when surveying the jail facilities, he noticed that the deputies responded immediately to the calls on the call-buttons. He recommended that the floor deputies carry a portable hand-held radio to augment communications with both the other floor deputies and the floor control center.

Cox characterized the level of sexual abuse in the jails as high but not unusual. He stated that large metropolitan areas like Houston that have high crime rates reflect correspondingly high levels of violence in their jail facilities. He found that the level of suicides in these facilities was low and that the rate of all other incidents was average.

While Mr. Cox agreed with plaintiffs' experts that there remained at the jail vestiges of inmate control, it was his view that to the extent there was control, it was of a positive nature. Further, he believed that because a hallman system or building tender system was formerly used in Harris County, many repeat offenders have a vested interest in seeing that the system remain. It was his opinion that the deputies were aware of the problem and were attempting to correct it.

Because of the poor visibility of the housing units and the inadvisability of sending an officer into those areas without a back-up, Cox recommended the procedure known as "racking-out." Racking-out, as he explained it, is a procedure whereby the mid to high risk inmates in multiple occupancy housing units are locked out of their sleeping cells during the daytime hours and forced to spend their time in the common dayroom. This procedure allows the guards to observe all inmates from the safety vestibule without the. necessity of actually venturing into the dayroom to view the inmates who may be in their sleeping cells. (Defendant's Exhibit No. 44 at pp. i and 13.)

Cox recommended further that dormitories should be used for inmates classified as "**low risk** such as inmate workers, or for passive classifications which require **minimal supervision such as geriatric inmates.**" (Defendant's Exhibit No. 44 at p. 13).

Finally, he, too, criticized the use of a strict statewide ratio that applies to jails of all sizes and designs and noted that most experts in the field prefer staffing plans based on posts rather than ratios. He noted that the Federal Bureau of Prisons had adopted the use of post analysis.

### C. F. Warren Benton and Don Stoughton (for Plaintiffs)

The plaintiffs' expert witnesses on jail staffing plans were F. Warren Benton ("Benton") and Don Stoughton ("Stoughton"). Actually, Benton was the project director of the Harris County Corrections Plan of 1974, a study requested by defendants before the construction of the new central jail. Like Cox, these gentlemen prepared a detailed and professional report which evaluated the Sheriff's post staffing plan. (Plaintiffs' Exhibit No. 103.) The majority of their testimony consisted of explaining the report's findings. The findings of the Benton/Stoughton report were, to a large degree, consistent with the findings of the Cox report. The major area of dispute, and the one of greatest concern to the Court, involved the appropriate minimum number of posts required to provide a constitutionally acceptable staffing plan. Like the other experts, Messrs. Benton and Stoughton had problems with the jails' physical design, the reliance placed upon call-buttons and the shortage of staff found in both facilities.

Rather than paraphrase their observations regarding the physical design of both facilities, the Court finds the following excerpt from the Benton/Stoughton report particularly revealing:

1. The physical environments

The physical environments of both facilities impede the abilities of deputies to provide for safety and security, due to inadequate sightliness, inadequate life safety conditions, and extensive use of multiple occupancy. The Central Jail contains a variety of types of housing areas. Most of the units provide for multiple occupancy in increments of anywhere from 4 to 24 bunks. In each housing area, it is not possible (nor is it procedurally permitted) for a single deputy to enter a housing area unassisted. In most instances, it is possible for the deputy to enter a security vestibule at the entrance to the housing area to observe activities within the unit. A deputy cannot go beyond the vestibule without the assistance of a second deputy, who remotely unlocks the inside door to the dayroom area after the outside door to the hallway is secured. Without exception, these observation points do not permit full observation of the unit. Most 4-man cells open at a right-angle to the entrance, so that less than 20% of the space within the cell can be observed. In the larger domitories at the outside corner of each quadrant, visibility is limited by a wall, and the deputy can only see those areas of the dorm open to glass view panels and the door (if it is open). To compound the problem, the degree of observation in most of the multiple occupancy areas is reasonably predictable— the deputy cannot increase or decrease visibility to any great extent by shifting the vantage point of observation.

In the Detention Center, the housing areas consist of wings of cells, with varying capacities. These housing areas offer greater opportunities for observation by staff than is possible in the Central Jail, since the deputies can shift vantage points as they move around the guard corridors. However, [the] size of the wings provides inmates [with] a good deal of advance warning for observation by deputies, and the density of occupancy makes it difficult to see clearly into the larger dorms. In the Detention Center, it is possible for a [sic] one deputy to walk around the guard corridor without the aid of a second deputy, but it would be dangerous and impractical for one deputy to enter within the inmate housing area without a backup.

2. Frequency and intensity of supervision

Primarily as a result of the physical design deficiencies, deputies infrequently

enter actual housing areas as a routine part of their supervisory duties....

In practice, it appears to the consultants that deputies do make frequent observations from the hallway areas, security vestibules, and guard corridors. However, it has been established above that a substantial portion of inmate housing areas cannot be observed from these locations. Direct observations, made after entry into the housing areas where the inmates are located, require two deputies—one to enter and observe, and the other to lock and unlock entry areas and to back up the inside deputy.

Certain areas of housing units (such as within multiple cells in the Central Jail) are therefore not directly observed for long periods of time—routinely periods of several hours, and potentially periods of days on end. For example, the supervisor for the female units in the Central Jail stated that deputies actually entered and inspected within the cell areas of housing units approximately once per week per shift. Counts were conducted by requiring inmates to move into the dayroom areas.

Such unobserved and unsupervised blind areas are present in practically all housing areas within the Central Jail. Inmates cannot expect adequate and sufficient supervision or protection by staff in such areas....

(Plaintiffs' Exhibit No. 103 at pp. 16 and 17). These findings are entirely consistent with the other testimony that the Court received on that issue.

Mr. Benton was of the view that sexual assault within the jail system was abnormally high. Moreover, he was concerned with the high degree of inmate control within the housing units. (*See* Plaintiffs' Exhibit No. 211), and noted that such control was a symptom of inadequate supervision. Unlike Mr. Cox, Mr. Benton was concerned with the problems which might occur as a result of such inmate control. He and Mr. Stoughton concluded that closer supervision provided by properly trained deputies at least would have significantly lessened the instances of sexual assault or other violence.

Both Mr. Benton and Mr. Stoughton urged that the deputies should engage in "indirect supervision" with the inmates. Indirect supervision, in short, constitutes frequent visits to the cell block itself, whereas "direct supervision" entails remaining in the cell or housing unit on a continuing basis. While direct supervision is considered to be a progressive approach among penological experts, it is also considered more expensive and is not required to satisfy constitutional standards.

The plaintiffs' experts recommended that "indirect supervision" should occur at a rate of twice per hour. During their visits to the cell, the officers should observe *inter alia* the following: (1) the physical environment to ensure sanitation, fire and life safety and procedural compliance, and (2) the inmates for such things as physical appearance, emotional changes, body language, and pairing among inmates. Such observations result in an attempt to be anticipatory and to reduce the potential for risk within the housing units. Mr. Stoughton emphasized that Harris County's routine which requires the deputies to visit the cellblocks at a frequency of twice per eight hour shift instead of twice per hour would be totally unacceptable in many other states.[8]

---

8. Although apparently ignored at present, the post orders recently promulgated for the Detention Bureau and the Harris County Sheriff's Department set out the specific duties and objectives of the Quadrant Deputy as the following, in relevant part:

(a) Attending Roll Call to obtain a general briefing on activities or incidents that have occurred during the previous Watch or planned for the current Watch that may influence inmate attitudes and/or Jail operations.

(b) Obtaining a briefing from Quadrant Deputy who he/she is relieving regarding temperament of inmates assigned to the Quadrant and conditions within the Quadrant that may require closer monitoring and/or additional attention or action.

(c) Performing an initial inspection of each cellblock and/or cell in the Quadrant to obtain first-hand an evaluation of the attitude and temperament of inmates working or housed in the Quadrant.

Plaintiffs' experts were also advocates of the post staffing plan. However, their plan calls for the addition of more posts than either the Sheriff's plan or Mr. Cox's plan. Briefly, the Benton/Stoughton plan calls for nine deputies on each housing floor at the central jail and detention center during the day and evening shifts and seven deputies on the floor during the night shift. On the first two shifts, this breaks down to two deputies per quadrant and one in the floor control center over and above any utility deputies who may be on the floor assisting inmate movement. During the night shift, when the prisoners are locked into their sleeping cells, his plan calls for one deputy per quadrant, one deputy in the picket and two rovers that cover the entire floor. As stated previously, two deputies per quadrant are required on the day and evening shifts because it takes two deputies to be able to enter safely the dayrooms in the housing units in order to achieve total observation. A synopsis of their proposed post staffing plan for both facilities is found in Plaintiffs' Exhibit No. 103 at pages 5 and 36 through 47 and Defendant's Exhibit Nos. 49 through 51. Further, the plaintiffs' experts agreed with Mr. Cox regarding the deployment of additional sergeants on the floors. They also generally agreed with Cox about the need for additional deputies in the non-housing areas such as recreation and outside transportation.

Benton emphasized that the call-button system is not a reliable emergency reporting system. He too noted that an inmate under attack from a fellow inmate might be unable to reach the call-button.

Both Benton and Stoughton disagreed vigorously with Cox's proposal to rack-out the prisoners during the day. They stated that confining the inmates solely to a dayroom increases population density to dangerous levels. In their opinion, the confining of up to twenty-four inmates in a small area for long periods of time would result in more tension than is already present. Consequently, they believed that the increased crowding would yield more assaults than would be prevented by the increased observability of the inmates. They concluded that allowing the inmates to use their cell sleeping areas during the day was vitally important.

## CONSTITUTIONAL REQUIREMENTS

■ The Eighth Amendment protects all inmates from cruel and unusual punishment. *Estelle v. Gamble,* 429 U.S. 97, 102–03, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976). "[T]he constitutional mandate against cruel and unusual punishment is not a warranty of pleasant prison conditions." *Ruiz v. Estelle,* 679 F.2d 1115, 1145 (5th Cir.), *amended in part,* 688 F.2d 266 (5th Cir.1982), *cert. denied,* 460 U.S. 1042, 103 S.Ct. 1438, 75 L.Ed.2d 795 (1983). On the other hand, "[p]rison conditions can be so bad that it is cruel and unusual to force inmates to endure them." *Sampson v. King,* 693 F.2d 566, 568 (5th Cir.1982) (citing *Gates v. Collier,* 501 F.2d 1291, 1301 (5th Cir.1974)), and every "prisoner has a right to be protected from the constant threat of violence and from sexual assault." *Jones v. Diamond,* 636 F.2d 1364, 1373 (5th Cir.1981) (*en banc*), *cert. denied,* 453 U.S. 950, 102 S.Ct. 27, 69 L.Ed.2d 1033 (1982) (citing *Withers v. Levine,* 615 F.2d 158 (4th Cir. 1980)).

■ In reviewing prison or jail conditions, this Court's extremely narrow role is limited to "enforcing constitutional stan-

(e) Observing the physical, attitudinal, mental and emotional condition of each inmate to detect signs of distress or need for medical, psychological or other special services.
(f) Observing each inmate to detect any signs of changes that may have occurred in his/her adjustment during incarceration.
(g) *Performing irregularly but at a frequency not less than hourly a full and complete inspection of each cellblock and/or cell to ob-*serve directly the condition of each inmate assigned to the Quadrant.
(h) Investigating discreetly the circumstances within each cellblock and/or cell immediately when changes in either the dynamics of the area are detected or the conduct or adjustment pattern of an individual inmate has been observed, detected or reported.
Defendant's Exhibit No. 36, at pp. 90 and 93. (Emphasis supplied.)

dards rather than assuming superintendence of jail administration." *Jones v. Diamond,* 636 F.2d at 1368 (citing *Miller v. Carson,* 563 F.2d 741 (5th Cir.1977) and *Williams v. Edwards,* 547 F.2d 1206 (5th Cir.1977)). In determining whether the conditions of confinement under review violate the established minimum constitutional standards, this Court must determine whether the totality of the circumstances violates "contemporary standards of decency." *Sampson v. King,* 693 F.2d at 568–69 (citations omitted). With these fundamental principles in mind, the Court turns now to consider the threshold issue of whether the totality of the conditions of the jails constitutes cruel and unusual punishment.

■ The physical conditions of both jail facilities, their physical design and their manner of operation have resulted in conditions that can only be classified as cruel and inhuman under any current standards concerning human decency. Inmate beatings and homosexual rapes and attacks are prevalent. (Refer to inmate testimony; Plaintiffs' Exhibit No. 103 at pp. 23 through 25.) Inmates without any homosexual tendency have been forced by other stronger inmates to perform acts of oral sodomy as well as anal intercourse. Many of these attacks have endured for long periods at a time. Among the female inmates, unwelcomed lesbianism is apparent. (Testimony of Sgt. Robin Talton.) The resulting high level of violence and sexual activity cannot be attributed to simply one source. Inadequate staffing levels, inadequate supervisory techniques, a poor physical design and an unreliable communication system all contribute to the high levels of violence found in both facilities. The sum total of all of these acts and practices results in deprivations of the rights of inmates under the Eighth Amendment and under state statutes.[9] Inmates must be

protected from one another; sufficient security is a must for any jail. *Smith v. Sullivan,* 553 F.2d 373, 380 (5th Cir.1977).

■ The evidence further demonstrates that the defendants have known of the inadequacy of the staffing levels for many years. From the entry of the Consent Judgment in 1975 to the Court's remedial order entered later that year, to the 1978 hearings, to the 1983 staffing hearings, up until this most recent hearing, serious staffing shortages have persisted. In all fairness, the defendants have not totally disregarded their obligations. The Commissioners Court has increased the Sheriff's operating budget each year at the Sheriff's request, and the numbers of employees in the detention bureau have been increased. However, these actions have not been sufficient to protect the inmates from inadequate guard supervision, brutal beatings and homosexual attacks. The result is a continuous pattern of deprivations which clearly reach constitutional dimensions. Once such deprivations are established, the Fifth Circuit has declared that this Court has both the power and the duty to intervene. Specifically, the Fifth Circuit has stated:

> Where constitutional deprivations are established, either in specific instances, *e.g., Johnson v. Avery,* 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969) (regulation infringing inmates' right of access to the courts), or by the totality of conditions within an institution, *e.g., Gates v. Collier,* 501 F.2d at 1309 ("[e]ach factor separately ... may not rise to constitutional dimensions; however, the effect of the totality of these circumstances is the infliction of punishment on inmates violative of the Eighth Amendment"), the federal courts may, and must, if the issue is appropriately presented, intervene. *E.g.,*

9. The Commissioners Court has a duty under state law to maintain a safe and suitable jail, TEX.REV.CIV.STAT.ANN. art. 5115 (Vernon Supp.1984), and it must approve the number of jail guards when they became necessary for the safekeeping of prisoners and the security of jails. TEX.REV.CIV.STAT.ANN. art. 6871 (Vernon 1960). Likewise, the Sheriff owes a duty to

prisoners to keep safely a person committed to his custody. TEX.CODE CRIM.PRO.ANN. art. 16.21 (Vernon 1977); TEX.REV.CIV.STAT.ANN. art. 5116 (Vernon Supp.1984). The Court realizes, however, that a violation of state law, without more, does not justify federal judicial intervention. *Smith v. Sullivan,* 611 F.2d 1039, 1045 (5th Cir.1980) (citations omitted.)

*Hutto v. Finney,* 437 U.S. 678, 685–88, 98 S.Ct. 2565 [2570–72], 57 L.Ed.2d 522 (1978); *Procunier v. Martinez,* 416 U.S. [396] at 405–06, 94 S.Ct. 1800 [40 L.Ed.2d 224 (1974)]. *See also Newman v. Alabama* [559 F.2d 283 (5th Cir.1977)], *supra; Pugh v. Locke* [406 F.Supp. 318], *supra.* As indicated above, the federal courts have the power, and the duty, to make their intervention effective. To prevent further constitutional deprivations, a court may order forms of relief not normally required by the Constitution but nevertheless necessary given the circumstances if the court's efforts are to be successful. *See, e.g., Hutto v. Finney,* 437 U.S. at 685–88, 98 S.Ct. 2565 (affirming order forbidding more than 30 days of punitive isolation); *Miller v. Carson,* 563 F.2d 741, 751 (5th Cir.1977) (affirming order requiring outdoor exercise).

*Smith v. Sullivan,* 611 F.2d 1039, 1044 (5th Cir.1980) (footnote omitted). Consequently, this Court's ability to issue an order dealing with the adequate staffing and inmate supervision at the defendants' jails is beyond serious dispute.

However, despite its clear authority to become involved in the present staffing problems, the Court recognizes its limits when fashioning an appropriate remedy. "[F]ederal courts should keep their eyes on the main objective, the Eighth Amendment command for the eradication of cruel and unusual punishment." *Taylor v. Sterrett,* 600 F.2d 1135, 1141 (5th Cir.1979) (quoting *Newman v. Alabama,* 559 F.2d 283, 287 (5th Cir.1977), *modified,* 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114, *cert. denied,* 438 U.S. 915, 98 S.Ct. 3144, 57 L.Ed.2d 1160 (1978)). Furthermore, "[t]he remedy must be designed to accomplish that goal [of eradicating cruel and unusual punishment], not to exercise judicial power for the attainment of what we as individuals might like to see accomplished in the way of ideal prison conditions." *Id.*

The Fifth Circuit has provided some broad guidelines in fashioning a remedy for inadequate staffing levels. In *Williams v.*

*Edwards,* 547 F.2d at 1213, the Fifth Circuit stated:

> The number of prison guards necessary to assure a constitutional level of inmate safety must bear some reasonable relationship to the total number of inmates. A proper ratio should be established by reference to the various kinds of facilities at the prison, taking into account the capacity and purpose of each, thereby determining the number of guards required to provide security in each; or by proof showing usual adequate ratios established at other institutions where the level of prison violence is acceptable; by proof of learned studies, or by other proof acceptable to the District Judge.

In this case, the Court has received the benefit of testimony from four highly qualified outside experts whose recommendations the Court has carefully considered.

The Fifth Circuit has also stated that "state standards may sometimes serve as a useful guide in a federal court's determination and redress of constitutional deprivations." *Smith v. Sullivan,* 611 F.2d at 1045 (citation omitted). The Fifth Circuit observed the usefulness of state standards in *Williams v. Edwards,* when it held:

> State codes reveal to the District Judge the minimum standards by which the state itself proposes to govern itself concerning habitability. Such a standard is a valuable reference for what is minimal for human habitation in the public view, thus serving as an indicator of "evolving notions of decency," *Newman v. Alabama, supra,* 503 F.2d at 1330 n. 14; *see Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958). State codes also are a valuable index into what levels of decency the public, expressing itself through the Legislature, is prepared to pay for. Therefore, we approve the use of state sanitation and fire codes because in this manner the federal district judge can minimize his intrusion into the details of prison administration, allowing the state's own published standards to govern. The District Judge did

not err in making use of the state fire and sanitation codes.

547 F.2d at 1214. In this regard, as previously alluded to, this Court up to the present time has consistently sought professional guidance from the Minimum Jail Standards of the Texas Commission on Jail Standards and has valued highly the evaluations and opinions advanced by that Commission.

Having established the Court's authority to intervene in the aforementioned staffing and supervisory issues, and having further established and defined the contours of the Court's ability to fashion an effective remedy, the Court turns now to the selection of a carefully tailored minimum staffing plan and post order sufficient to correct the existing constitutional infirmities.

## ABANDONING THE ONE–TO–FORTY–FIVE RATIO

■ While this Court is not prone routinely to jettison summarily a considered course of action vigorously advocated by the defendant Sheriff and supported by the Texas Commission on Jail Standards, it is clearly apparent that they were wrong. Contrary to the May, 1983 hearing when the one-to-forty-five ratio was approved based on evidence from local law enforcement sources, the current hearing focused largely on the views of independent outside jail experts who unanimously advocated the general concept of a post staffing plan for Harris County. With that concept in mind the Court will analyze the evidence in order to determine the precise nature of the staffing plan to adopt and implement.

The initial step the Court shall take in arriving at a minimum staffing plan is to discard the Court's acceptance of and adherence to the one-to-forty-five ratio. The abandonment of the strict ratio in favor of a more efficient staffing plan based on post

assignments is fully supported by the record. The post plan, by requiring that a minimum number of guards be stationed on the floor at all times, has the dual advantage of eliminating the Sheriff's burdensome need to keep track of inmate population fluctuations on a housing floor while simultaneously allowing the Court readily to verify compliance. Additionally, although not known to the Court at the time it accepted the one-to-forty-five ratio, a 1981 study funded by the National Institute of Corrections concluded that "[t]he one-to-forty-five officer ratio is also far below both accepted correctional practice and the law as quoted above." (Plaintiffs' Exhibit No. 111 at page 25.) The evidence also establishes that the ratio has no accepted or established penological basis. (Plaintiffs' Exhibit No. 205A.) Finally, as previously stated, the Texas Commission on Jail Standards has, at the defendants' insistence, amended its rules to allow, under certain conditions, staffing based on post assignments.

■ Having discarded the one-to-forty-five ratio in favor of a staffing plan based on post assignments, the Court turns initially to § 217.14.004 Minimum Jail Standards (1984) of the Texas Commission on Jail Standards for possible assistance in formulating a plan. A review of this newly amended rule illustrates that it provides this Court with absolutely no guidance in formulating a minimum staffing plan. It merely provides that the Commissioners Court and the Sheriff may collaborate to submit a staffing plan for approval by the Texas Commission on Jail Standards. The Court has several problems with that procedure.

First, the Court seriously questions whether the Commissioners Court should be constantly involved in formulating the Sheriff's staffing plans.[10] Although the Commissioners Court does have general re-

---

**10.** Some may believe that this statement applies equally to this Court. However, this Court's limited authority to intervene in these staffing plans has been ventilated sufficiently above and requires no further explanation. Finally, the Court notes the absence of any restraint in § 217.14.004 (1984) on the Commissioners Court's ability to intervene in the formulation of the Sheriff's staffing plans.

sponsibilities in connection with the operation of the jail, TEX.REV.CIV.STAT.ANN. art. 5115 (Vernon Supp.1984) and 6871 (Vernon 1960), the day-to-day operations of the jail such as the formulation of adequate staffing plans is committed to the office of the Sheriff. TEX.REV.CIV.STAT.ANN. art. 5116 (Vernon Supp.1984). The new rule as revised provides the opportunity for the Commissioners Court and county budgetary politics to dictate staffing levels rather than what the Sheriff independently finds necessary. This concern has been voiced by at least one Texas sheriff, and the Court believes that it is a legitimate concern. (Plaintiffs' Exhibit No. 113.)

Second, and perhaps most importantly, a plain reading of § 217.14.004 (1984) reveals that it contains no minimum ratio or other meaningful guideline in formulating a minimum staffing plan. The result is that the Court is left to review whatever staffing plan the defendants have successfully lobbied the Texas Commission on Jail Standards to approve. After reviewing the transcript of the meeting of the Texas Commission on Jail Standards in September of 1983 as well as the subsequent acts of that Commission which culminated in its ultimate acceptance of Harris County's proposals for staffing changes within a matter of weeks, this Court has serious doubt as to the ability of the Commission to maintain its required neutrality and objectivity in the face of powerful and influential political pressures. This is especially so when considering that the Texas Commission not only adopted the 1 to 48 ratio when the 1 to

45 ratio was considered by the National Institute of Corrections to be unacceptable; it then waived the 1 to 48 ratio in favor of Sheriff Heard's post staffing plan, a plan which utilizes far less deputies than are required by the 1 to 45 ratio and which was found to be constitutionally inadequate by plaintiffs' and defendants' experts alike. *See* Appendix A; Plaintiffs' Exhibits Nos. 100, 103 at pp. 5 and 36 through 47, and 111 at p. 25; Defendant's Exhibit No. 44 at pp. 29 through 31 and 44.[11] Consequently, the Court is compelled to reassess its pattern of past reliance upon the guidelines and approval actions of the Texas Commission on Jail Standards as they pertain to a staffing plan for the Harris County Jails. Based on the record developed at the hearing, the Court is clearly persuaded that the formulation of an appropriate staffing plan must be based largely upon the testimony of the independent outside jail experts.

## THE COURT'S STAFFING PLAN

▉ After careful consideration of all of the evidence presented, the Court has arrived at what it believes to be a minimum staffing plan sufficient to correct the existing constitutional infirmities. In formulating this plan, the Court has found that specific recommendations from all four outside experts have merit.[12] Further, the Court should emphasize that the Court's plan focuses solely on staffing levels as to the housing floors of both facilities. The Court's plan does not address the issue of utility deputies, recreation deputies, depu-

---

**11.** Defendants may urge that the Court attacks the Sheriff's plan unfairly because it does not take into account utility deputies or other ancillary staff who may be assigned to inmate supervision should the need arise to ensure "a safe and suitable jail." The Court, however, finds this "musical chair" approach to be unacceptable. It not only requires more of the "managerial nightmare" syndrome complained of by defendants, but also leaves the Court with no meaningful way of checking the adequacy of inmate supervision.

**12.** The Court has also taken into consideration a report prepared in January of 1979 by the National Institute of Corrections. This report, while prepared utilizing only the blueprints of

the central jail, gives the Court further insight into the then current state-of-the art in the area of staffing. The following table fairly represents the number of deputies recommended for the various housing units of the central jail.

| Unit/Floor | | Sergeant Posts in Parentheses | | |
| --- | --- | --- | --- | --- |
| Shift | Floor Capacity | Day | Eve | Nte |
| Two—Medical | 163 | 6(1) | 6(1) | 5(1) |
| Three—Psychiatric | 278 | 8(1) | 8(1) | 7(1) |
| Four—Female Housing | 253 | 8(1) | 8(1) | 6(1) |
| Five—Trusty | 458 | 7(1) | 7(1) | 6(1) |
| Six—Male Housing | 409 | 10(1) | 10(1) | 7(1) |
| Seven—Male Housing | 373 | 10(1) | 10(1) | 7(-) |
| Total | 1934 | 49(6) | 49(6) | 38(5) |

Plaintiffs' Exhibit No. 100.

ties necessary to meet the shift relief factor, or deputies involved in other miscellaneous duties both on and off of the jail premises. These needs are better left to the Sheriff's discretion. The number of deputies and sergeants in the Court's plan is the minimum number required on the housing floors at all times. Sergeants and deputies assigned to these posts may not leave the housing floor to assist in inmate transfers. With these conditions and limitations in mind, the Court concludes that the following summary of deputy post requirements for each facility shall constitute the minimum number of posts that the Sheriff must staff:

Summary of Sergeant and Deputy Post Requirements

| Unit/Floor | Floor Capacity | Court Order (Sergeant Posts in Parentheses) | | |
|---|---|---|---|---|
| Shift | | Day | Eve | Nte |
| **Central Jail** | | | | |
| Two | N.A.* | 5(1) | 5(1) | 5(1) |
| Three | 192 | 5(1) | 5(1) | 3(1) |
| Four | 247 | 9(1) | 9(1) | 7(1) |
| Five | 452 | 9(1) | 9(1) | 7(1) |
| Six | 367 | 9(1) | 9(1) | 7(1) |
| Seven | 367 | 9(1) | 9(1) | 7(1) |
| Eight | 367 | 9(1) | 9(1) | 7(1) |
| Nine | 295 | 9(1) | 9(1) | 7(1) |
| Ten | 367 | 9(1) | 9(1) | 7(1) |
| Eleven | 367 | 9(1) | 9(1) | 7(1) |
| **Twelve | 403 | 9(1) | 9(1) | 7(1) |
| **Detention Center** | | | | |
| One | +/− 333 | 9(1) | 9(1) | 7(1) |
| Two | +/− 333 | 9(1) | 9(1) | 7(1) |
| Three | +/− 333 | 9(1) | 9(1) | 7(1) |
| Total Capacity | 4423 | 118(12) | 118(12) | 92(9) |

TOTAL HOUSING FLOOR POSTS 328(33)

* Not Available
** Needless to say, if a floor or quadrant of a floor is not occupied, the assignments as set forth in this order will not apply.

A review of the Court's plan reveals that the Court has opted for two guards per quadrant on the housing floors in the central jail and detention center. While the defendants' expert held contrary views from the others on whether one or two guards per quadrant were necessary, the Court concludes that two guards per quadrant constitute the minimum number required to meet constitutional muster. First, actual entry into and touring of the dayrooms is the only way guards can see into all of the sleeping cells. The evidence clearly establishes that for one guard safely to make regular rounds into the heart of the dayrooms, he must have a back-up guard at the door of the security vestibule. Secondly, the defendants' expert based his recommendation, at least in part, upon the implementation of the "racking out" procedure which this Court finds to be totally counter-productive to achieving the goal of reduced violence among inmates. Thirdly, all experts agree that if a classification system were implemented whereby lower risk inmates were separately grouped on one floor, the need for guards on that floor could be reduced. However, the Court is

obligated to look at the system as it now exists, and not as it might become at some future date. Should such a system be developed hereafter, the Court will be receptive to reconsidering its present staffing requirements.

## POST ORDERS ON FREQUENCY OF OBSERVATION OF INMATES

Finally, the Court reluctantly finds that it must inject itself further into the area of jail administration in so far as it relates to frequency of observation of inmates within the housing units. Both the Minimum Jail Standards as they now exist as well as the Post Orders of July 9, 1984, as approved by Sheriff Heard and Commander Reynolds provide for observation at a frequency not less than hourly. Specifically, the post orders clearly direct the quadrant deputy to perform "irregularly but at a frequency not less than hourly a full and complete inspection of each cell block and/or cell to observe directly the condition of each inmate assigned to the Quadrant." (Defendant's Exhibit No. 36 at pp. 90 and 93; *See also* this order, Footnote 8.) Additionally, Messrs. Benton and Stoughton both advocated strongly that inmate observation within the housing areas should occur at a frequency of twice per hour.

 Despite the enactment of its own post orders, the evidence at the hearing revealed that the officers make a visual inspection of the cells at a frequency of only twice per eight hour shift. In fact, defendants and their expert, Mr. Cox, took the position that more frequent "intrusions" would result in a decrease in privacy of the inmates and a consequent increased level of tension. (Testimony of Dr. Elion and Mr. Cox.) However, the great weight of credible evidence at the hearing demonstrates clearly that there is a lack of adequate inmate supervision by the deputies, and that such lack of supervision is a causative factor in the level of inmate control

and violence in the jails. Whether or not the inmate control is considered benevolent or malevolent or whether the rate of sexual abuse is considered "high" or "abnormally high," this Court is convinced that more frequent deputy-inmate contacts and supervision, provided by a properly trained staff, will improve the deplorable conditions that now exist. Moreover, when faced with a choice between protecting the inmates' privacy rights and the inmates' safety, the Court must opt for the latter. Unlike the right to safety, the "[l]oss of freedom of choice and privacy are inherent incidents of confinement." *Hudson v. Palmer*, —— U.S. ——, 104 S.Ct. 3194, 3201, 82 L.Ed.2d 393 (1984) (quoting *Bell v. Wolfish*, 441 U.S. 520, 537, 99 S.Ct. 1861, 1873, 60 L.Ed.2d 447 (1979)). Accordingly, the Sheriff is directed to ensure that his deputies visit the inmate cells at a frequency of no less than once per hour.[13]

## CONCLUSION

This Court, abundantly aware that federal courts are not in the business of running jails, has ordered the institution of a minimum staffing plan and post order in the defendants' jails. However, this remedy for the existing constitutional deficiency is not novel. A number of courts have condemned as unconstitutional an unsafe prison environment resulting from the lack of sufficient security staffing and subsequently ordered increases in staffing and supervision. *See Smith v. Sullivan*, 553 F.2d at 374 (jail guard visit each inmate-occupied area once an hour and one non-inmate guard present on each floor at all times). *Williams v. Edwards*, 547 F.2d at 1213 (two guards in open dormitories at all times); *Gates v. Collier*, 501 F.2d at 1309 (three guards in each barracks during nighttime hours); *Pugh v. Locke*, 406 F.Supp. 318, 333 (M.D.Ala.1976), *aff'd sub nom Newman v. Alabama*, 559 F.2d 283 (5th Cir.1977) (one guard inside and one outside each living unit at all times); *Jones*

---

**13.** The Court emphasizes that its current order requiring cell visits at a frequency of once per hour represents the minimum required to comport with constitutional standards as they now

exist. However, the Sheriff and his staff are encouraged to engage in more frequent inmate contact within the cells should time and money permit.

*v. Metzger,* 456 F.2d 854 at 855 (6th Cir. 1972) (re-assignment of the sheriff's employees to provide more guards in the jail.) *See also Ruiz v. Estelle,* 503 F.Supp. 1265, 1303–07 (S.D.Tex.1980), *aff'd in relevant part,* 679 F.2d at 1115; *Vest v. Lubbock Cty. Commissioners Court,* 444 F.Supp. 824, 835 (N.D.Tex.1977). Considering the Court's alternatives, the staffing plan and post order for supervision of inmates are both the least expensive and least intrusive method of correcting the existing unconstitutional conditions.[14]

Further, protestations from the defendants that they do not have enough money to fund the Court-ordered staffing increases, or that the county has not budgeted for the additional staff this year or that they do not have the authority to expend funds for additional staffing are factually unpersuasive in view of the inordinate period of time which has passed in remedying staffing deficiencies and are legally unsupportable. That the defendants' inadequate staffing levels are caused by inadequate funding by the county or lack of authority over funds is no defense to the maintenance of conditions which violate the Constitution. *See Stewart v. Winter,* 669 F.2d 328, 332 (5th Cir.1982); *Smith v. Sullivan,* 611 F.2d at 1043–44; *Newman v. Alabama,* 559 F.2d at 286; *Williams v. Edwards,* 547 F.2d at 1212–1213; *Smith v. Sullivan,* 553 F.2d at 378; *Gates v. Collier,* 501 F.2d at 1319–1320; *Alberti v. Sheriff of Harris County,* 406 F.Supp. at 669. In short, no motions for reconsideration of relief from this order will be entertained based on these defenses.

While recognizing that plaintiffs have requested the Court to make a finding of contempt on the part of defendants as to the May 1983 Order, the Court, as previously discussed, has no choice but to abandon that order in favor of the present Post Assignment Plan because of the overwhelming evidence presented by plaintiffs' and defendants' experts alike.[15] It is clear from prevailing caselaw that a finding of contempt cannot now be made in a case such as this where the Court has been compelled to abandon the underlying order on which such a determination would be based. *Smith v. Sullivan,* 611 F.2d 1050 (5th Cir.1980). Accordingly, although the Court views plaintiffs as prevailing parties, a determination of contempt on the part of defendants will be deferred until defendants have had an opportunity to comply with the mandates of this present order on staffing.

The defendants shall be given a period of sixty days from the entry of this order to effectuate fully the staffing plan and post order for inmate supervision as outlined above. Good-faith allegations by the plaintiffs that the defendants have failed to staff one or both facilities according to the plan or have failed to ensure that defendants enter the cellblocks at the frequency directed by this order, within the allotted time frame will result in an immediate hearing in which the defendants will be required to show cause why they should not be held in contempt. Should the Court make a specific finding of contempt based on clear and convincing evidence at the conclusion of that hearing, the defendants shall be allowed an additional fourteen (14) days to implement the Court's order. Continued noncompliance will result in the imposition of sanctions commensurate with current caselaw. *See Mobile County Jail*

**14.** For example, although no evidence was received on this point, the Court believes that the Court-ordered staffing increases are less expensive than Court-ordered renovation of the new jail's physical design to permit more efficient supervision with fewer guards. Also, the Court's staffing plan is confined solely to staffing on the housing floors and gives the Sheriff wide latitude in use of utility and other deputies.

**15.** In addition, plaintiffs complain at length about alleged procedural irregularities within the Texas Commission on Jail Standards concerning the adoption of the Harris County Proposals and the approval of the Sheriff's Post Assignment Plan. However, because the Court does not view these matters as material to the issue of determining a staffing plan for the Harris County Jails which is commensurate with the Constitution, that material will not be discussed in this Order.

*Inmates v. Purvis,* 551 F.Supp. 92 (S.D. Ala.1982), *aff'd,* 703 F.2d 580 (11th Cir. 1983) ($5,000 for each day that defendants are out of compliance with court order); *Powell v. Ward,* 487 F.Supp. 917 (S.D.N.Y. 1980), *aff'd as modified,* 643 F.2d 924 (2nd Cir.), *cert. denied,* 454 U.S. 832, 102 S.Ct. 131, 70 L.Ed.2d 111 (1981) ($5,000 to be paid one month from entry of order, and $1,000 thereafter for any additional day that defendant is not in substantial compliance); *Palmigiano v. Garrahy,* 448 F.Supp. 659 (D.R.I.1978) (daily fine of $1,000 for each day that defendants are out of compliance). If compliance is to be contested, the defendants' remedy is to appeal.

Since the initiation of this lawsuit in 1972, this Court has consistently presumed that the Sheriff was acting in good faith and was utilizing to the utmost his professional judgment and expertise in administering the Harris County Jails. Likewise, the Court has relied heavily upon the Texas Commission on Jail Standards since its formation for guidance and direction whenever Court intervention into the jail system was required. It is now apparent from the record that the course of action urged by the defendants and the Commission upon this Court for the proper operation of the Harris County Jails falls woefully short of the current state of the art in addition to failing constitutional standards.

It is with considerable reluctance and only after a careful survey of the record of twelve years of litigation that this Court now finds itself compelled to enter more fully into jail administration and to rely heavily on outside expert opinions in lieu of the advices and projections of the Sheriff and his local officers and staff. In 1975, the defendants agreed to provide jail guards and staff sufficient for the security of the jail facilities without the use of inmate control. In 1983, the defendants proposed and agreed to adhere to a one-to-forty-five staffing ratio. It is this Court's opinion that the defendants have failed consistently to follow either the letter or the spirit of their own representations or the resulting Court's orders. Moreover, it appears to the Court after reviewing carefully the evidence presented during these recent hearings that the Texas Commission on Jail Standards has fallen prey to the powerful influences of Harris County. Accordingly, the presumption of good faith and reliability which was once unqualifiedly applied by this Court to the defendants and the Texas Commission on Jail Standards is now cast in serious jeopardy. From this point forward, the opinions of the defendants and the Commission alike will be scrutinized with extreme care by this Court and checked against outside expert evaluations.

For twelve years this protracted civil rights litigation has proceeded to address in the Court a myriad of issues relevant to the Harris County Jails. It had been hoped by this Court that some termination point might be in the offing. Nothing can do more to delay such a termination than scenarios such as the one addressed in this order. The Court has a duty to ensure that the inmates in the Harris County Jails are not deprived of their constitutional right to be protected from cruel and unusual punishment. While the Court realizes that any resulting potential tax increases or fines will ultimately be borne by the citizens of Harris County, the Court outlines the above procedure in order to serve notice to the defendants that the Court, either coercively or coactively, intends to ensure that the staffing of the county jails comports with what the Constitution requires. It is so ORDERED.

## APPENDIX A

### COMPARATIVE SUMMARY OF THE MAY 1983 ORDER (1 TO 45 RATIO) AND THE THREE ALTERNATIVE POST STAFFING PLANS PRESENTED AT THE JULY 1984 HEARING *

| Floor | Floor Capacity | May 1983 Order (1 to 45 Ratio) | | | Sheriff's Plan | | | Cox Plan | | | Benton/Stoughton Plan | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Shift | | Day | Eve | Nte | Day | Eve | Nte | Day | Eve | Nte | Day | Eve | Nte |
| *Central Jail* | | | | | | | | | | | | | |
| Two | N.A.** | 5 | 5 | 5 | 3(0) | 3(0) | 3(0) | 5($_1$) | 5($_1$) | 5($_1$) | 5($_1$) | 5($_1$) | 5($_1$) |
| Three | 192 | 4 | 4 | 4 | 4(0) | 4(0) | 4(0) | 4($^1$) | 4($^1$) | 4($^1$) | 5($^1$) | 5($^1$) | 3($^1$) |
| Four | 247 | 6 | 6 | 6 | 5(1) | 5(1) | 5(1) | 6(1) | 6(1) | 5(1) | 9(1) | 9(1) | 7(1) |
| Five | 452 | 11 | 11 | .11 | 5(0) | 5(0) | 5(0) | 6(1) | 6(1) | 5($_1$) | 9(1) | 9(1) | 7($_1$) |
| Six | 367 | 9 | 9 | 9 | 5(1) | 5(1) | 5(1) | 6(1) | 6(1) | 5($^1$) | 9(1) | 9(1) | 7($^1$) |
| Seven | 367 | 9 | 9 | 9 | 5(0) | 5(0) | 5(1) | 6(1) | 6(1) | 5($_1$) | 9(1) | 9(1) | 7($_1$) |
| Eight | 367 | 9 | 9 | 9 | 5(1) | 5(1) | 5(1) | 6(1) | 6(1) | 5($^1$) | 9(1) | 9(1) | 7($^1$) |
| Nine | 295 | 7 | 7 | 7 | 5(0) | 5(1) | 5(1) | 6(1) | 6(1) | 5(1) | 9(1) | 9(1) | 7(1) |
| Ten | 367 | 9 | 9 | 9 | 5(0) | 5(0) | 5(0) | 6(1) | 6(1) | 5(1) | 9(1) | 9(1) | 7(1) |
| Eleven | 367 | 9 | 9 | 9 | 5(1) | 5(1) | 5(1) | 6(1) | 6(1) | 5($_1$) | 9(1) | 9(1) | 7($_1$) |
| Twelve | 403 | 9 | 9 | 9 | 5(0) | 5(0) | 5(1) | 6(1) | 6(1) | 5($^1$) | 9(1) | 9(1) | 7($^1$) |
| *Detention Center* | | | | | | | | | | | | | |
| One | +/− 333 | 8 | 8 | 8 | 4(0) | 4(0) | 4(1) | 6($_1$) | 6($_1$) | 5($_1$) | 9($_1$) | 9($_1$) | 7($_1$) |
| Two | +/− 333 | 8 | 8 | 8 | 4(1) | 4(0) | 4(0) | 7($^1$) | 7($^1$) | 5($^1$) | 9($^1$) | 9($^1$) | 7($^1$) |
| Three | +/− 333 | 8 | 8 | 8 | 5(0) | 5(1) | 5(1) | 7(1) | 7(1) | 5(1) | 9(1) | 9(1) | 7(1) |
| **Total Capacity 4423** | | 111 | 111 | 111 | 65(5) | 65(6) | 65(9) | 83(12) | 83(12) | 69(9) | 118(12) | 118(12) | 92(9) |
| **TOTAL 1-SHIFT POSTS** | | | 333 | | | 195(20) | | | 235(33) | | | 328(33) | |

\* Sergeant Posts in Parenthesis

\*\* Not Available

Plaintiffs' Exhibit 103 at 5; Defendant's Exhibits 44 at 29–31; Defendant's Exhibits 49 and 50