Lawrence R. ALBERTI, et al.

v.

Johnny KLEVENHAGEN, Sheriff of Harris County, Texas, et al.

Civ. A. No. 72–H–1094.

United States District Court, S.D. Texas, Houston Division.

April 10, 1985.

Jim Oitzinger, Houston, Tex., for plaintiffs.

Roderick Lawrence, Asst. County Atty., Houston, Tex., atty. for defendants Commissioners Court.

Ray Speece, Asst. Dist. Atty., Houston, Tex., for defendant Sheriff Klevenhagen.

## ORDER

CARL O. BUE, Jr., District Judge.

On December 18, 1984, after listening in two separate hearings to nine days of testimony and reviewing scores of documents, this Court issued an Order ("the December 1984 Order") directing the defendants to hire and train additional deputies and sergeants for actual guard duty on the housing floors of the Harris County Jails in order to correct the existing constitutional deficiencies prevailing therein. The functions and assignments of utility deputies, recreation deputies, deputies necessary to meet the shift relief factor, or deputies involved in other miscellaneous duties, both on and off of the jail premises, were outside the scope of the Court's Order as those issues did not directly impinge upon the actual safety of the inmates on a given floor and were thus better left to the administrative discretion of the sheriff.[1] Moreover, the Court recognized its judicial limits when fashioning a remedy, considered carefully the testimony of four highly qualified outside penological experts, and adopted a staffing plan designed solely to accomplish the goal of eradicating or at least minimizing unsafe living conditions for inmates within the Harris County Jails which conditions under the law constitute cruel and unusual punishment.

Now, some two months later, the defendants reappear, not to seek a modification of the Court's plan or of the time limits within which it is to be implemented, but rather to stay its execution entirely until the appeal process is completed. Not unexpectedly, plaintiffs, along with their memorandum in opposition to defendants' motions to stay, also have filed their motion for contempt for failure to comply with the Court's December 1984 Order. Having carefully reviewed the arguments and submissions of counsel in these matters, the Court is abundantly aware of the applicable law when a

---

1. The total number of guards to be hired, given the parameters of the Court's post staffing plan, was left to the parties to calculate and was not a part of the December 1984 Order.

stay is requested, as well as defendants' actions in responding to the December 1984 Order. Thus, it needs little time to reach its decision that the motions to stay should be denied in all respects and that an order directing defendants to answer why they should not be held in contempt should be issued at once.

## I.

■■■ The Fifth Circuit has reviewed many times the criteria to be applied in determining whether a court should stay an injunction pending appeal. So well-established in this circuit as to be a rubric, the criteria required to be established by the movant are as follows:

(1) whether the movant has made a showing of likelihood of success on the merits;

(2) whether the movant has made a showing of irreparable injury if the stay is not granted;

(3) whether the granting of the stay would substantially harm the other parties; and

(4) whether the granting of the stay would serve the public interest.

*Ruiz v. Estelle*, 650 F.2d 555, 565 (5th Cir.1981) (per curiam) (citing cases). However, "on motions for stay pending appeal the movant need not always show a 'probability' of success on the merits; instead, the movant need only present a substantial case on the merits when a serious legal question is involved and show that the balance of the equities weighs heavily in favor of granting the stay." *Id.* Nonetheless, "[l]ikelihood of success remains a prerequisite in the usual case even if it is not an invariable requirement. Only 'if the balance of equities (i.e. consideration of the other three factors) is ... *heavily tilted* in the movant's favor' " will a stay be issued in its absence, "and, even then, the issue must be one with patent substantial merit." *Ruiz v. Estelle*, 666 F.2d 854, 857 (5th

Cir.1982), *quoting, Ruiz,* 650 F.2d at 565–66. Guided by these principles, the Court considers defendants' present motions.

## II.

### *Likelihood of Success on the Merits*

■■■ In this circuit,[2] the threshold question to be answered when determining whether a federal court may interject itself into the administration of a jail facility is "whether the totality of the circumstances violates 'contemporary standards of decency'," thus constituting cruel and unusual punishment. *Sampson v. King*, 693 F.2d 566, 568–569 (5th Cir.1982) (citations omitted). If that question is answered in the affirmative, then a federal court has both the power and the duty to intervene. *Smith v. Sullivan*, 611 F.2d 1039, 1044 (5th Cir.1980). However, despite the clear authority of a federal court to intervene to prevent further constitutional deprivations, a court is limited when fashioning a remedy: "[t]he remedy must be designed to accomplish that goal [of eradicating cruel and unusual punishment], not to exercise judicial power for the attainment of what we as individuals might like to see accomplished in the way of ideal prison conditions." *Taylor v. Sterrett*, 600 F.2d 1135, 1141 (5th Cir.1979) (*quoting Newman v. Alabama*, 559 F.2d 283, 287 (5th Cir.1977), *modified*, 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114, *cert. denied*, 438 U.S. 915, 98 S.Ct. 3144, 57 L.Ed.2d 1144 (1978)). It was with these considerations in mind that the Court analyzed the testimony of witnesses, the scores of exhibits, and the arguments and submissions of counsel; it was with these considerations in mind that the Court determined which course of action to follow.

The December 1984 Order requires that defendants maintain a specified minimum staffing plan within sixty (60) days of its issuance. *Alberti v. Sheriff of Harris County, Texas*, 600 F.Supp. 443, 461–463

---

**2.** The defendants seem to prefer the holdings of the Fourth and Ninth Circuits. Although the Court believes that the facts of this case satisfy also the standards of those Circuits for deter-

mining a federal court's authority with respect to jail reform, the Court is constrained to follow Fifth Circuit precedent.

(S.D.Tex.1984). Simply stated, the Court's plan, arrived at after careful consideration of all of the evidence presented, requires that two guards per quadrant and one guard in "the picket"[3] be present at all times on the housing floors in the central jail, each of which is an acre and a quarter in size, as well as the detention center during the day and evening watches.[4] The Order requires also that the deputies visit the inmate cells at a frequency of no less than once per hour. *Id.* at 462. However, as stated earlier, the Court's plan did not address the use of utility deputies, recreation deputies, deputies necessary to meet the shift relief factor, or deputies involved in other miscellaneous duties, as the Court believed that these issues were better left to the Sheriff's administrative discretion.

Apart from the enormous areas to be patrolled and the large number of inmates to be supervised, there were several reasons why the Court concluded that two guards per quadrant constituted the minimum number of guards required to meet Constitutional muster. First, the Court had no difficulty in determining from the evidence that a high level of violence existed in the jails. *Id.* at 450. The inmates' testimony, corroborated in large measure by the expert witnesses of both parties, established that the violence in the jails was widespread and will likely increase as the jail population approaches capacity, that there was a high degree of inmate control within the housing units, and that the existing plan and supervisory regulations were insufficient to protect adequately the inmates personal safety. *Id.* at 450, 452–455. In addition, the inmates and experts testified that the electronic call-button system was an ineffective and ineffi-

cient substitute for human surveillance. *Id.* at 451, 453, 454, 456.

Moreover, to the Court's surprise and dismay, all experts uniformly agreed that the physical design of the new jail from a security point of view was one of the poorest that they had ever seen. *Id.* at 451, 452, 454, 455. In short, the physical design contains so many blind spots and routinely unobservable areas that the officers' ability to supervise the inmates on a continuing basis is ineffective. *Id.* In addition, the cell configuration contains a mix of dormitories, multiple occupancy cells and single cells. *Id.* at 451. Consequently, in order to check the well being of the people in the cells, the officers must physically go into the cell areas. *Id.* at 451, 452, 455. Finally, Mr. Buchanan, the classification expert, testified that all levels of security risk inmates were assigned to each floor, thus making it impossible to staff the floors on a security classification basis. *Id.* at 451.

It was the Court's conclusion that the high level of violence, sexual assault, and inmate control could not be attributed to one source. Rather, inadequate staffing levels, inadequate supervisory techniques, a poor physical design, and an unreliable communications system all contributed to the problems found in both facilities. *Id.* at 457. Thus, the Court concluded that the sum total of all of those acts and practices resulted in deprivations of the rights of inmates to a safe and suitable place of incarceration and thereby constituted a violation of the Eighth Amendment.

Second, when formulating an appropriate plan, the Court was forced to abandon its prior order ("the May 1983 Order") to which defendants had agreed which required the implementation of a one-to-forty-five (1:45) ratio.[5] *Id.* at 459–460. All par-

---

**3.** "The picket" is the trade name for the central floor control center where one deputy electronically monitors the floor. *Alberti,* 600 F.Supp. at 450.

**4.** The Court's plan requires also the deployment and hiring of additional sergeants, the number of which was agreed upon by plaintiffs' and defendants' experts alike.

**5.** The applicable standard, or "one-to-forty-five" (1:45) ratio as it has come to be known, required the following:

> Inmates shall be supervised by an adequate number of corrections officers to comply with the requirements of state law and these standards and to carry out the facility plans established pursuant to these standards. In no event shall this be fewer than one corrections officer on each floor of the facility on which

ties criticized the use of a strict state-wide ratio that applied to jails of all sizes and designs and contended that most experts in the penological field now prefer staffing plans based on "post" assignments rather than ratios. *Id.* at 452, 454, 456, 459. Accordingly, both defendants' and plaintiffs' experts submitted proposed staffing plans based upon a post assignment theory.

The state's own regulatory body for jails, the Texas Commission on Jail Standards ("Commission"), although previously relied on heavily by the Court, was now of dubious assistance in formulating an appropriate staffing plan. First, their newly adopted jail standard, restructured at the instance of defendants' efforts before the Commission, contained no meaningful guideline from which to formulate a minimum staffing plan.[6] Second, had it relied on the state standard as it presently exists, the Court would be left to review whatever staffing plan the defendants had successfully lobbied the Commission to approve. After reviewing the transcripts of the proceedings before the Commission in which the standard was amended, the Court had serious doubts as to the capacity of that body to maintain its required objectivity in the face of the political pressures of Harris County. *Id.* at 460. Accordingly, the Court was persuaded that it must look elsewhere and that the fashioning of an appropriate staffing plan to meet constitutional standards must be based largely on the testimony of the outside jail experts.

Thirdly, when comparing the plans proposed by the experts, the Court concluded that one guard per quadrant, as proffered by defendants' expert, Mr. Norman R. Cox, was inadequate. As stated previously, the evidence at the hearings clearly established that actual entry into and touring of the dayrooms is the only way guards can see into the sleeping cells. In addition, for a guard to safely make regular rounds into the dayrooms, he must have a back-up guard in the security vestibule. Finally, the defendants base their recommendation, in part, upon the implementation of a "racking out" procedure which this Court found counter-productive to achieving the goal of reduced violence among inmates.[7] *Id.* at 456, 461.

Reluctantly injecting itself further into the area of jail administration, the Court ordered that deputies visit the inmate cells at a frequency of no less than once per hour. *Id.* at 462. While plaintiffs' experts recommended a higher frequency, both the Minimum Jail Standards as they now exist as well as the Sheriff's post orders of July 9, 1984, provide for "a full and complete inspection of each cellblock" "at a frequency not less than hourly." *Id.* at 449, 455, 456 n. 8. Notwithstanding the require-

---

10 or more inmates are housed, nor less than one corrections officer per 45 inmates.
Minimum Jail Standards § 217.14.004 (1980).

**6.** The new rule for supervision of inmates reads as follows:

**Supervisory personnel.** Inmates shall be supervised by an adequate number of corrections officers to comply with state law and these standards. One corrections officer shall be provided on each floor of the facility where 10 or more inmates are housed, with no less than one corrections officer per 48 inmates or increment thereof for direct inmate supervision. This officer shall provide visual inmate supervision not less than hourly.... A waiver may be granted by the commission as to minimal supervisory personnel-to-inmate ratios required elsewhere in these rules. A plan, concurred in by both commissioners court and sheriff's department may be submitted to the commission which provides for adequate and reasonable staffing of a jail facility. This rule shall not preclude the Texas Commission on Jail Standards from requiring staffing in excess of minimum requirement when deemed necessary to provide a safe, suitable and sanitary jail nor preclude submission of variance requests as provided by statute or these rules. (Adopted 12/26/83.)
Minimum Jail Standards § 217.14.004 (1984).

**7.** As Mr. Cox explained it, "racking-out" is a procedure whereby the mid to high risk inmates in multiple occupancy housing units are locked out of their sleeping cells during the daytime hours and forced to spend their time in the common dayroom. This procedure allows the guards to observe all inmates from the safety vestibule without the necessity of actually venturing into the dayroom to view the inmates who may be in their sleeping cells. (Defendant's Exhibit No. 44 at pp. i and 13.)

ments of the state or of defendants' own post orders, the testimony indicated clearly that the officers at the jails now make a visual inspection of the cells no more than twice per eight (8) hour shift. Indeed, it is the position of defendants then and now that more frequent "intrusions" would result in a decrease in privacy of the inmates and a consequent increased level of tension. Nonetheless, "the great weight of credible evidence at the hearing demonstrated clearly that there is a lack of adequate inmate supervision by the deputies, and that such lack of supervision is a causative factor in the level of inmate control and violence in the jails." *Id.* at 462.

Thus, despite its clear authority to become involved in the present staffing problems of the jails in light of the totality of conditions therein, the Court carefully limited itself in fashioning an appropriate remedy to the main objective of achieving safe living conditions for inmates by eradicating conditions constituting cruel and unusual punishment. A number of courts have condemned as unconstitutional similar unsafe prison environments which resulted from the lack of sufficient security staffing and have subsequently ordered increases in staffing and supervision. *See Smith v. Sullivan,* 553 F.2d 373, 374 (5th Cir.1977) (jail guard visit each inmate-occupied area once an hour and one non-inmate guard present on each floor at all times); *Williams v. Edwards,* 547 F.2d 1206, 1213 (5th Cir.1977) (two guards in open dormitories at all times); *Gates v. Collier,* 501 F.2d 1291, 1309 (5th Cir.1974) (three guards in each barracks during nighttime hours); *Pugh v. Locke,* 406 F.Supp. 318, 333 (M.D. Ala.1976) *aff'd sub nom Newman v. Alabama,* 559 F.2d at 283 (one guard inside and one outside each living unit at all times); *Jones v. Metzger,* 456 F.2d 854 at 855 (6th Cir.1972) (re-assignment of the sheriff's employees to provide more guards in the jail.) *See also Ruiz v. Estelle,* 503 F.Supp. 1265, 1303–07 (S.D.Tex.1980), *aff'd in relevant part,* 679 F.2d 1115 (5th Cir. 1982), *cert. denied,* 460 U.S. 1042, 103 S.Ct. 1438, 75 L.Ed.2d 795 (1983); *Vest v. Lub-*

*bock Cty. Commissioners Court,* 444 F.Supp. 824, 835 (N.D.Tex.1977).

Considering the Court's alternatives, the staffing plan and post order for supervision of inmates seemed to be the least intrusive method of correcting the existing constitutional deficiencies. Accordingly, it is the conclusion of this Court that defendants have failed to make a showing of either "likelihood of success on the merits" or "substantial case on the merits."

### III.

*Irreparable Injury to the Defendants*

Defendants contend that should they be required to hire and train and pay the additional deputies necessary to implement the Court's plan, they will suffer irreparable injury and financial loss. In addition, defendant Klevenhagen asserts that "the monies required to be expended for compliance with the Court's Order would have to be taken from other portions of the Harris County budget and other essential services would have to be cut back, services which could not be provided in the absence of the funds expended in complying with the Court's Order other than by a tax increase, imposing the cost on all the citizens of Harris County, Texas, who would thus be irreparably harmed." (Memorandum in Support of Defendants'/Appellants' Motion to Suspend Injunction at 31). The Court is unimpressed by defendants' assertions in this regard. Furthermore, such a position based on county budgetary considerations does not comport with the law. *See Stewart v. Winter,* 669 F.2d 328, 332 (5th Cir. 1982); *Smith v. Sullivan,* 611 F.2d 1039 at 1043–44 (5th Cir.1980); *Newman v. Alabama,* 559 F.2d at 286; *Smith v. Sullivan,* 553 F.2d at 378; *Williams v. Edwards,* 547 F.2d at 1212–1213; *Gates v. Collier,* 501 F.2d at 1319.

Following the issuance of the December 1984 Order, both the Houston Post and the Houston Chronicle quoted defendants as stating that three hundred (300) additional guards would be needed to comply with the

Court's order at a cost of $8,000,000.00 yearly to the county. (Houston Chronicle, Dec. 19, 1984, at 1; Houston Post, Dec. 19, 1984, at 1.) However, in defendant Commissioners Court's motion to stay and memorandum in support thereof, filed only two months after the issuance of the December 1984 Order, two drastically different figures were offered as being representative of the number of guards needed to implement the Court's order:

> The plan required the hiring and training of some two hundred sixty seven (267) additional guards. (Motion to Stay at 1.) The implementation of the Court's order would require a substantial increase ... over and above the Defendant's already approved increase of 43 deputies and 22 sergeants for fiscal 1985. The additional number of deputies required by the Court's plan and order is 116 at an annual cost of $3,287,788. (Memorandum in Support of Defendant's Motion to Stay at 8.)

Likewise, in his memorandum, defendant Klevenhagen contends that, after taking into account the number of sergeants and deputies present on the housing floors as well as the shift relief factor, a total of one hundred eighty-one (181) deputies and sergeants would have to be hired to implement the Court's plan at a cost to the county of $5,130,000.00.[8] However, a budget request

for the fiscal year beginning March 1, 1985 which provides for the hiring of forty-three (43) deputies and twenty-two (22) sergeants has been approved by the Commissioners Court.[9] Thus, to implement the Court's order, defendant Klevenhagen asserts that he will need to provide "116 additional deputies above and beyond the number stated to be on duty after fulfillment of the Sheriff's budget request" at a cost of $3,287,-788.00.[10] (Memorandum at 29, 30).

In sum, defendants, who were quoted by the local newspapers as stating that they would have to hire three hundred (300) additional guards as a result of the Court's Order at a cost to the County of $8,000,-000.00 yearly now contend that for them to implement the Court's Order they must hire one hundred sixteen (116) additional guards at a cost to the County of $3,287,-788.00, or, less than half of the guards and expenditures represented to the press and public as being necessary. Moreover, it is of noteworthy significance that the Court's staffing plan of May, 1983, which was agreed upon by defendants and essentially arrived at as a result of the testimony of Sheriff Heard, required the deployment of approximately three hundred thirty-three (333) guards for the central jail and detention facilities for a twenty-four (24) hour period. *Alberti* 600 F.Supp. at 465 app.

---

8. According to defendant Klevenhagen, there were two hundred twenty-seven (227) deputies assigned to the living floors and engaged in supervising inmates on January 17, 1985. When a relief factor of five (5.0) is considered, the total number of additional deputies needed to implement the Court's plan is one hundred sixty-nine (169). Defendant Klevenhagen contends also that there were twenty (20) sergeants present on January 17, 1985. Using the same relief factor, he asserts that he would be required to hire twenty-two (22) more sergeants in order to comply with the Court's mandate. Consequently, he contends that a total of one hundred eighty-one (181) deputies and sergeants would have to be hired to implement the Court's plan. (The Court questions how defendants arrived at the figure of one hundred eighty-one (181) as the sum total of one hundred sixty-nine (169) plus twenty-two (22). By its own calculations, the Court concludes that one hundred sixty-nine (169) plus twenty-two (22) equals the sum total of one hundred ninety-one (191)).

According to defendant Klevenhagen, the total cost of the additional deputies and sergeants required by the Court's December 1984 Order is approximately $5,130,000.00 per year.

9. These figures, which represent the sergeant and deputy post assignment plan recommended by the defendants' expert, Mr. Cox, were rejected by the Court after carefully examining the safety needs of the inmate. Hence, a budget providing for the procurement of deputies and sergeants in accordance with the "Cox plan" runs directly counter to the Court's December 1984 Order.

10. Likewise, the Court questions how defendants arrived at the figure of one hundred sixteen (116). Given the difference in calculations set forth in note 8 above, the Court concludes that this figure should correctly be one hundred twenty-six (126), at a cost of $3,571,218.00. This is accurate, of course, only if the other figures presented by defendants are accurate.

The present staffing plan, although arrived at by using a post assignment theory rather than a guard-to-inmate-ratio theory, requires the deployment of three hundred twenty-eight (328) guards per twenty-four (24) hour period. Although these figures do not take into account a shift relief factor, it is this Court's conclusion that if defendants had complied in good faith with the May 1983 Order, they would have very few, if any, additional guards to hire today.[11] In short, defendants' current complaints are a direct result of their failure to live up to their prior representations that they would abide by the Court's staffing plan of May, 1983.

Accordingly, given the discrepancies in the figures presented to the public *vis a vis* the press and legal memoranda on file as well as the failure of the defendants to comply with the May 1983 Order, the Court concludes that the defendants' contentions as to irreparable harm are spurious, misleading and designed primarily for the purpose of mobilizing public sentiment in their favor.

## IV.

### *Substantial Harm to Plaintiffs*

Defendants assert that there is no evidence to suggest that the plaintiffs will be significantly harmed or injured in the time during which the appeal is pending. Noting that the number of incidents of violence and sexual assaults which were reported and referred for prosecution to the Harris County District Attorney's Office was limited to seventeen (17) for the year 1984, defendants assert that the rate of such assaults are "well within accepted constitutional limits and less than the rate of such assaults in the general population" in the Houston metropolitan area. (Klevenhagen Memorandum at 32; County Commissioners Memorandum at 9). The Court finds this contention to be without merit as well

as illustrative of defendants' insensibility to the safety of the inmates housed in the Harris County Jails.

At the hearings held during July and September of 1984, this Court heard the testimony of a cross-section of inmates in the central jail. Despite the inherent credibility problems normally attached to inmate testimony, the Court was persuaded that a high level of inmate violence and inmate control still existed in the jails. This impression was corroborated in large part by the expert witnesses of both parties. *Alberti*, 600 F.Supp. at 453, 455. The Court then and now believes that:

> The physical conditions of both jail facilities, their physical design and their manner of operation have resulted in conditions that can only be classified as cruel and inhuman under any current standards concerning human decency. Inmate beatings and homosexual rapes and attacks are prevalent. (citations omitted). Inmates without any homosexual tendency have been forced by other stronger inmates to perform acts of oral sodomy as well as anal intercourse. Many of these attacks have endured for long periods at a time. Among the female inmates, unwelcomed lesbianism is apparent.

*Id.* at 457. Accordingly, the sum total of "inadequate staffing levels, inadequate supervisory techniques, a poor physical design and an unreliable communication system" all lead the Court to the inescapable conclusion that members of the plaintiff class will continue to be substantially injured during confinement if the execution of this Order is stayed.

### V.

### *Public Interest*

As the defendants so aptly state, "[p]ublic policy requires compliance with the dictates of the Constitution, the supreme law

---

**11.** The Court notes also the fact that defendants have never sought a modification of the sixty (60) day mandate issued by the Court. This fact, too, leads the Court to the conclusion that any harm incurred by the defendants or the

taxpayers as a result of a later finding of contempt and consequent sanctions is a result of the actions or inactions of defendants themselves.

of the land." (Klevenhagen Memorandum at 33). The Court is greatly dismayed by the defendants' persistent failure to do so.

On February 4, 1975, a Consent Judgment was entered in this case whereby the defendants promised to bring themselves into compliance with federal and state standards. Specifically, the Commissioners Court agreed to "provide jail guards/staff sufficient for security for jail facilities without the use of inmate assistance," and the Sheriff agreed to use "diligent good faith efforts" to "employ a sufficient and adequately trained staff, guards and deputies to assure the protection of persons incarcerated in the Harris County Jails." *Alberti,* No. 72–H–1094, slip op. at 3 (S.D. Tex. Feb. 4, 1975).

Thereafter, defendants' compliance therewith has been questioned and examined in numerous proceedings before this Court. After the hearings held in 1975, this Court found that despite the entry of the Consent Judgment, the jails continued to be unsafe and understaffed. *Alberti,* 406 F.Supp. 649, 669 (S.D.Tex.1975). As a result, defendants were ordered to provide for the hiring of a sufficient jail staff based upon a ratio of one jailer for every twenty (20) inmates. It was further ordered that inmates were not to act in a supervisory or administrative capacity nor administer disciplinary action over other inmates. *Id.* at 678. That order was never appealed.

Although the ubiquitous issue of adequate minimum staffing levels surfaced several times, the Court relied heavily upon the Sheriff's assertions that once the new central jail was completed, the defendants would see to it that the facilities would be staffed adequately. Accordingly, in late 1982 and in early 1983, shortly after the new jail was completed, hearings were held to determine an appropriate staffing plan for both the new facility and the detention center. The defendants admitted that both facilities were critically understaffed on the housing floors, but assured the Court that they would be in compliance with state law, the one-to-forty-five (1:45) ratio, by the end of June, 1983. Accordingly, at the vigorous insistence of the defendants, the Court adopted the one-to-forty-five (1:45) minimum staffing ratio for purposes of staffing the Harris County jails. *Alberti,* slip op. at 1, 2, 8 (S.D.Tex. May 20, 1983). That Order, too, was never appealed. However, rather than hiring and training the additional staff needed to comply with that Order, basically designed by them, the defendants set out to change the state standards on jail staffing promulgated by the Texas Commission on Jail Standards, thereby paving the way for a drastic modification of the May, 1983 staffing plan. Although their actions before the Commission were cloaked in sophistication and professionalism, their ultimate goal is apparent to this Court: less security staff for the Harris County Jails. *Alberti,* 600 F.Supp. at 447–450.

In the hearings held before this Court in 1984, as well as in the legal memorandum on file, the defendants changed direction. Instead of admitting that the Sheriff's latest staffing plan was constitutionally defective, the defendants demand to be left alone by the Court, stating that "the Court's Order violates judicial authority" and is questionably unconstitutional. (County Commissioners Memorandum at 10). Yet the Sheriff's proposed plan, which was later set aside by defendants in favor of Mr. Cox's plan, required sixty-five (65) less security staff on the housing floors than that recommended by their own expert, Mr. Cox, as being the minimum staff needed to provide a safe and suitable jail and was far below the one-to-forty-five (1:45) ratio requirement then in place. In addition, while Mr. Cox found in his report, dated July, 1984, that the poor configuration of the new central jail requires that officers make rounds more often to provide effective supervision, that it was improper for the Sheriff to rely upon the call-button system as the primary emergency response mechanism, that the level of sexual abuse was high, that there remained at the jail vestiges of inmate control, and that twenty-two (22) additional sergeant posts and forty-three (43) additional deputies would be necessary, defendants failed to heed his

advice; not until March of 1985 did defendants address the problem and provide the necessary budgetary assistance to ensure the implementation of the minimum staffing plan as recommended by Mr. Cox.

The defendants contend that the Court should use as a measure of violence the number of cases of assault reported by the inmates which were ultimately referred for prosecution, a total of seventeen (17) for 1984. The insistence of the defendants that the incidents of violence to be considered are only those which are prosecuted by the Attorney General furthers the impression that fights in the jail are an accepted reality. Such an acceptance of fighting has been considered by the Fifth Circuit and is considered by this Court to be evidence of deliberate indifference to the security needs of inmates. *See Stokes v. Delcambre,* 710 F.2d 1120, 1125 (5th Cir.1983).

Thus, given the procedural history of this case, the evidence presented at the hearings over the course of the last twelve years, and the memoranda submitted concurrent with these motions to stay, it has become clear that the defendants not only have failed to abide by the constitutional mandate, the Court's Order, or their own Consent Judgment to provide a safe and suitable jail, but have no intention of doing so. Such an affront to the public interest should not and cannot be tolerated by this Court which is obligated to articulate and uphold the applicable law as pronounced by the Supreme Court and the Court of Appeals for the Fifth Circuit.

## VI.

### *Conclusion*

In sum, it is this Court's view that defendants have failed to satisfy the requirements necessary for the granting of a stay pending appeal. While the constitutional questions are indeed substantial, it is clear in light of the totality of conditions at the Harris County Jails that the defendants are and have been in continuous violation of the constitutional mandate against cruel and unusual punishment. That inmates are subjected to a constant fear of violent attack, and that the defendants have failed, throughout the history of this case to provide a security staff adequate in training or in numbers to satisfy the minimum constitutional standard is strikingly apparent. Nonetheless, once a determination was made that the inmates were being subjected to deprivations of constitutional magnitude, the Court carefully tailored its remedy to achieve the sole goal of eradicating cruel and unusual punishment, as many courts in this and other circuits have done before. Given these parameters, it is this Court's view that defendants have shown neither a "probability of success on the merits" nor "a substantial case on the merits" as is required in order to stay the execution of a court order pending its appeal.

When balancing the equities in this case—irreparable harm to the defendants, substantial injury to the plaintiffs, and the public interest—the Court takes also into consideration a fourth equitable prong: the bad faith, indifference and inactions of the defendants. In short, any harm which might result to the defendants or to the taxpayers as a result of higher taxes is solely a result of defendants' own making. Had they complied with the staffing plan virtually designed by them and subsequently proposed and adopted by this Court in May of 1983, almost two years ago, the defendants would have relatively little additional hiring or expenditures to concern themselves with today. Having failed to do so and having been exposed by evidence in the 1984 hearings, defendants now wish to obfuscate the issues by creating the fiction in the eyes of the taxpayer that their dilemma is attributable to the orders of this Court. Nothing could be further from the truth. While the payment of additional taxes, if necessary, is distasteful to all of us, defendants cannot use this as an excuse to evade compliance with the laws of this country, even if it involves the constitutional rights of the inmates at the Harris County jails.

In contrast, should the Court grant a stay of the December 1984 Order, the inmates, many of whom are not convicted of any crime but are merely awaiting trial, will continue to be subjected to conditions long ago condemned by the Eighth Amendment of the Constitution. Further, in light of defendants' cavalier indifference to the mandates of their own Consent Judgment of 1975, the Court's orders, and the Constitution, this Court believes that to grant a stay would do serious violence to the public interest. Considering all of the above, it is the opinion of this Court that defendants have failed to establish a balance of equities favorable to them, much less a balance "heavily tilted" in their favor.

Finally, the Court is aware that the Fifth Circuit Court of Appeals may look favorably upon any motions to stay filed by the defendants. If the Court of Appeals does so, it will be out of an abundance of caution and out of a desire to be fair to all parties in view of the complexities of this case and their unfamiliarity therewith. However, having had before it for twelve years the law and facts concerning the defendants and their administration of the Harris County Jails, anything short of denying summarily defendants' motions to stay would be an abdication of this Court's judicial responsibility. It being clear that defendants have made no attempts to comply with the Court's Order of December, 1984, and that they have no intention of doing so, it is ordered that the defendants show cause at a hearing set for Friday, the 10th day of May, 1985, at 10 o'clock A.M. where counsel can be heard as to why defendants should not be adjudged to be in contempt. "Should the Court make a specific finding of contempt based on clear and convincing evidence at the conclusion of that hearing, the defendants shall be allowed an additional fourteen (14) days to implement the Court's order. Continued noncompliance will result in the imposition of sanctions commensurate with current caselaw." *Alberti*, 600 F.Supp. at 463. Counsel will submit legal memoranda containing all relevant cases on sanctions in a jail context ten (10) days beforehand.

It is so ORDERED.